STATE

v.

**Norman FREEMAN.**

**No. 83–28–Appeal.**

Supreme Court of Rhode Island.

March 20, 1984.

Dennis J. Roberts II, Atty. Gen., John Spirito, Jr., Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., Provi-

dence, Janice M. Weisfeld, Asst. Public Defender, for defendant.

## OPINION

WEISBERGER, Justice.

The defendant, Norman Freeman, is appealing from a conviction for voluntary manslaughter. He was tried by a Superior Court jury in April 1982 pursuant to an indictment charging him with the murder of Arthur Almeida. At the close of the state's case, the trial justice granted the defendant's motion for a judgment of acquittal in respect to the charge of murder in the first degree but denied the motion for acquittal of murder in the second degree. The jury returned a verdict of guilty of voluntary manslaughter; and the trial judge, after denying a motion for a new trial, sentenced the defendant to a twelve-year prison term, with seven years to serve, five years suspended, and five years' probation.

The defendant raises two issues in support of his appeal. First, he asserts that the trial justice violated his constitutional rights under the confrontation clause of the Sixth Amendment to the United States Constitution and also under article I, section 10, of the Rhode Island Constitution by refusing to allow defense counsel to cross-examine the prosecution's key witness on the issue of bias or motive. Second, he argues that the failure of the trial justice to give the jury a requested instruction on the defense of accident was erroneous and renders his conviction invalid. Although we consider the confrontation issue dispositive of this appeal, we shall first consider the propriety of the instructions of the trial justice since a new trial will be necessary in this case. However, the focus of our holding today is defendant's claim that he was denied his constitutional right to probe the issue of bias of the prosecution's key witness. We sustain defendant's appeal on this ground and remand the case for a new trial.

The testimony at trial established the following facts. The victim, Arthur "Sonny" Almeida, was a friend of defendant and had at one time lived with defendant and defendant's wife and two children. On the morning of August 6, 1981, Sonny and defendant began drinking beer together, consuming about a case of beer during the course of the day. In the afternoon, they left for Sonny's apartment where later, at around 5 p.m., an altercation erupted between them outside the apartment building. Both men appeared drunk. The defendant struck Sonny several times. As a result Sonny fell, hit his head on a manhole cover, and then began to vomit. Upon the arrival of a Providence rescue unit, Sonny refused medical treatment. Thereafter, the two men returned to defendant's apartment where they ate dinner and continued to drink beer. It is at this juncture that the facts leading to the death of Sonny become less clear. The sole witness to the events that followed (not including a two-year-old and a three-year-old who were also present) was Bernice Anderson, defendant's wife, whose testimony consists of two conflicting accounts of what happened in her home that evening.

At trial, Bernice testified that after dinner, defendant questioned Sonny about the identity of another man who had been present earlier in Sonny's apartment. Each time that Sonny responded that he did not know who the man was, defendant struck Sonny with an "open hand." She testified that defendant hit Sonny about four or five times, that two or three times the blows caused Sonny to fall backward from a seated position on a bed and hit his head on the footboard, and that at no time did Sonny defend himself. A final blow caused Sonny to fall backward from a standing position, hit a refrigerator, and then fall to the floor. She stated that Sonny began to vomit and gag and that defendant turned him over onto his stomach. She related that defendant would not allow her to call for a rescue unit, telling her that "Sonny's always like that when he gets drunk." Unable to lift Sonny onto a bed, they left him on the floor

and retired. Hours later, at around 12:30 a.m., now August 7, 1981, defendant woke her to tell her that Sonny was not breathing. The defendant called a rescue unit but instructed Bernice to report only that Sonny had fallen and not to say that defendant had hit him.

Complying, Bernice gave a statement to the police that Sonny had fallen in a drunken stupor, hitting his head on the refrigerator. The medical examiner ruled Sonny's death to be a homicide, and police arrested defendant on the same night, August 7, 1981, pursuant to a warrant which had been obtained earlier, and questioned him about Sonny's murder. Bernice, also present at the police station, gave a second statement repudiating her first account to the police and relating that Sonny had fallen and hit his head on the refrigerator after defendant had struck him several times.

I

## THE CHALLENGE TO THE JUDGE'S INSTRUCTIONS

 The defendant contends that the trial justice committed prejudicial error in refusing to charge the jury as follows:

"However, if in this case you find that the death of Arthur Almeida resulted from an accident, you must find the defendant not guilty."

The defendant cites in support of this construction *State v. Crough,* 89 R.I. 338, 152 A.2d 644 (1959). In *Crough* the trial justice did instruct that if the death of a child occurred by accident, the defendant was entitled to an acquittal. The court held that the charge as a whole was "correct and applied to the evidence." *Id.* at 353, 152 A.2d at 652–53.[1]

In the case at bar the trial justice defined manslaughter in the following terms:

"Now, manslaughter may be either voluntary or involuntary. Voluntary manslaughter is defined as an intentional homicide without malice aforethought in the heat of passion as a result of adequate provocation. Heat of passion means any emotions of the mind such as rage and anger.

"Involuntary manslaughter is defined as an unintentional homicide without malice aforethought committed either in the performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence."

Following its deliberations, the jury returned the verdict "guilty of voluntary manslaughter."

 We are of the opinion that defendant's contentions concerning the failure of the trial justice to give the requested instruction in this case are without merit. The trial justice's definition of voluntary manslaughter required an intentional killing "in the heat of passion as a result of adequate provocation." Such an instruction completely precludes a nonculpable, accidental homicide. Further, the trial justice's definition of involuntary manslaughter also precluded an accidental death unless it was brought about by "an unlawful act not amounting to a felony" or "in the performance of a lawful act with criminal negligence." We believe that the trial justice's instructions in this case were as adequate in excluding accident without criminal culpability as the instruction that was approved in *State v. Crough,* 89 R.I. at 353, 152 A.2d at 652–53. The term "accident" is a most indefinite term indeed. A death may well be brought about by unintentional means

---

1. For the purposes of evaluating defendant's requested instruction, we are assuming, without deciding, that the evidence in the case genuinely raised the issue of accidental death without the culpable involvement of the defendant. We do point out, however, that to the extent that defendant might rely on the prior inconsistent statement of his wife to raise the issue

of accident, such prior inconsistent statements are not admissible for the proof of the matter asserted but only for the purpose of impeaching or neutralizing the testimony given at trial. *State v. Roddy,* R.I., 401 A.2d 23, 35 (1979); *State v. LaPlume,* 118 R.I. 670, 679–80, 375 A.2d 938, 942 (1977); *State v. Bowden,* 113 R.I. 649, 661, 324 A.2d 631, 639 (1974).

that could be termed "accidental," but in the event that such death is the result of criminal negligence or an unlawful act not amounting to a felony, such homicide may well constitute manslaughter. Consequently, the instruction requested by defendant was highly susceptible of misleading the jury. This illustrates the danger of taking phrases from an appellate opinion without qualification as a basis for a charge to a jury. Appellate opinions are addressed to judges and lawyers and are not always appropriate for use in the communication of legal concepts to lay jurors.

The verdict of voluntary manslaughter required a finding that the death was brought about by intentional means and that the homicide was reduced from the crime of murder only by the finding of adequate provocation or heat of passion. In any event, the trial justice's instructions on voluntary manslaughter and involuntary manslaughter of necessity negated an accidental death not brought about by culpable conduct on the part of the accused, either deliberate or criminally negligent.

■ It is well settled that a trial justice need not adopt the language suggested by a defendant so long as those instructions reasonably set forth all of the propositions of law that relate to material issues of fact which the evidence tends to support. *State v. Manning*, R.I., 447 A.2d 393, 394 (1982); *State v. Ahmadjian*, R.I., 438 A.2d 1070, 1086 (1981); *State v. Verdone*, 114 R.I. 613, 619, 337 A.2d 804, 809 (1975). We conclude that in the case at bar the trial justice carried out his obligation and correctly framed the legal issues for the jury's consideration.

## II

### THE ISSUE OF DENIAL OF CONFRONTATION BY RESTRICTION OF CROSS–EXAMINATION

At the trial, the direct examination of Bernice by the prosecutor included the following:

"Q. And did you go to the police station?

"A. Yes.

"Q. And did you give them a statement?

"A. Yeah.

"Q. And did you give them a false statement?

"A. Yes, I did.

"Q. And why did you do that?

\* \* \* \* \* \*

"A. For one reason, because he [defendant] asked me, and I was scared."

Defense counsel twice attempted to elicit testimony to show that Bernice was taken to the police station under arrest—first, on cross-examination of Bernice and, second, on cross-examination of the arresting officer. The cross-examination of Bernice included the following:

"Q. Now, when you told Mr. Leach [prosecutor] that you initially gave a statement to the police department after you called the rescue squad and you went to the police headquarters, right?

"A. Yes.

"Q. And he asked you if that statement was false, and you said it was?

"A. Yes.

"Q. Is that right?

"A. Yes, the first one was false.

"Q. And you said it was false because you were scared. And what else did you say?

"A. Because Norman [defendant] told me to don't say that he hit him. Just say that he fell.

"Q. All right. The second statement that you gave the police department, you yourself was [sic] a suspect?

"MR. LEACH: Objection, Your Honor.

"Q. Were you not?

"MR. LEACH: Objection.

"THE COURT: Sustained. Need not answer.

"Q. You gave two statements to the police department, did you not?

"A. Yes.

"Q. All right. And the second statement is when both you and Norman

[defendant] were arrested and put in a van and taken to the police station?

"MR. LEACH: Objection, Your Honor.

"THE COURT: Sustained. You need not answer."

The defendant challenges the trial judge's refusal to admit evidence related to Bernice's arrest status as a result of this occurrence.[2]

The focal point of this controversy is the fundamental right of a defendant under the Sixth Amendment to the Constitution of the United States to confront witnesses against him. Embodied in this guarantee is a defendant's right to cross-examine the prosecution's witnesses as well as to present witnesses of his own. *See Pointer v. Texas*, 380 U.S. 400, 403–04, 85 S.Ct. 1065, 1067–68, 13 L.Ed.2d 923, 926 (1965); *see also Washington v. Texas*, 388 U.S. 14, 18–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019, 1022–23 (1967). The United States Supreme Court has declared the right of cross-examination to be a "primary interest secured by [the confrontation clause]" and has characterized it as the principal means by which to test the truth and veracity of a witness's testimony. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974). We too, under the guidelines of *Davis* and by the mandates of article I, section 10 of the Rhode Island Constitution, have defined this basic right. *See State v. Anthony*, R.I., 422 A.2d 921, 923–24 (1980).

In *Davis v. Alaska*, the prosecution's key witness in a burglary trial was under a protective order prohibiting the defense counsel from questioning him on his adjudication as a juvenile delinquent and on his probationary status in regard to a prior burglary. The defense counsel sought to introduce the witness's status to show bias. In holding that the order violated the defendant's right of confrontation under the Sixth and Fourteenth Amendments to the Constitution, the Court noted:

"[w]e do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony which provided 'a crucial link in the proof * * * of petitioner's act.'" *Id.* 415 U.S. at 317, 94 S.Ct. at 1111, 39 L.Ed.2d at 354.

In the case before us, the state's key witness, Bernice, was the sole eyewitness to the events immediately preceding Sonny's death. That being so, her testimony provided the "crucial link" in the proof establishing defendant's guilt. Her credibility therefore became the pivotal element on the issue of defendant's guilt. We addressed a similar problem in *State v. DeBarros*, R.I., 441 A.2d 549 (1982). In that case the defendant was totally precluded from cross-examining a crucial witness in respect to the issue of bias. In vacating the conviction, we recognized that "[t]he partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 354 (1974) (quoting 3A Wigmore, *Evidence* § 940 at 775 (Chadbourne rev. 1970)). We further observed:

"In respect to the limitation of the scope of cross-examination, we have recognized that the 'Sixth Amendment right of confrontation guarantees an accused the right to an effective cross-examination in all criminal matters. It is the principal means by which the credibility of the witness and the truthfulness of his testimony can be tested.' *State v. Anthony*, R.I., 422 A.2d 921, 923–24 (1980). This principle has been firmly established in *Davis v. Alaska, supra*. Such a right may not be given or withheld at the discretion of the trial justice. '[The] discretionary authority to limit cross-examination comes into play [only] after there has been permitted as a matter of right

---

**2.** At the time Bernice made her second statement, she had signed a waiver form that indicated that she was a suspect in the crime of "misprision of a felony" arising out of Sonny's death. This fact was not permitted to be disclosed at trial.

sufficient cross-examination to satisfy the Sixth Amendment.' *Springer v. United States,* 388 A.2d 846, 855 (D.C.App.1978) (quoting *United States v. Bass,* 490 F.2d 846, 857–858 n. 12 (5th Cir.1974))." R.I., 441 A.2d at 552.

■ It is clear that the purpose of defense counsel's questions about Bernice's arrest status was to place before the jury an issue of bias and motive. She testified on direct examination that she gave the first, untrue account of Sonny's death because she feared defendant, who had instructed her to lie. The defendant, however, was not permitted to meet her explanation with evidence from which a trier of fact could infer that Bernice had other reasons that prompted her to change her story. In short, defendant was completely barred from raising the issues of motive and bias. This, we find, contravened defendant's constitutional right of cross-examination. *See State v. DeBarros,* R.I., 441 A.2d at 552.

We reject the state's argument that because Bernice was never a suspect as a principal in Sonny's murder, defense counsel was merely harassing the witness and conducting a fishing expedition by his questions. On the night that defendant was arrested, both Bernice and defendant were transported to the police station in a police van. At the station, Bernice was led into one interview room, defendant into another; she had been given her *Miranda* warnings, and she had been notified that she was suspected of "misprision of a felony." It could certainly be argued by defense counsel that Bernice's perceived status might have created a significant motivation to induce her to alter her earlier story in order to protect herself from prosecution. It was the jury's function to decide whether this motivation was sufficient to cause the witness to testify falsely concerning the events leading to Sonny's death. However, an essential factual predicate of this theory was not disclosed.

We hold, therefore, that because Bernice's credibility was the vital element in establishing the defendant's guilt, the trial justice, by totally precluding the defendant from raising and probing the issues of motive, bias, or prejudice, effectively cut off the defendant's right to test Bernice's credibility fully and adequately. Thus, defendant's right to cross-examine as guaranteed by the confrontation clause of the Sixth Amendment to the United States Constitution and the parallel clause of article I, section 10, of the Rhode Island Constitution was abrogated. As in *State v. DeBarros, supra,* we cannot speculate or guess about the impact upon the jurors of the presentation of this theory of bias. We cannot state either " '(1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony.' " R.I., 441 A.2d at 552.

For the reasons stated, the defendant's appeal is sustained, the judgment of conviction is vacated, and the case is remanded to the Superior Court for a new trial.