## STATE

v.

## Anthony PARILLO.

## No. 83–171–C.A.

Supreme Court of Rhode Island.

July 12, 1984.

Dennis J. Roberts, II, Atty. Gen., Henry Gemma, Jr., Asst. Atty. Gen., for plaintiff.

Harris L. Berson, Providence, for defendant.

## OPINION

MURRAY, Justice.

This is an appeal by the defendant from his conviction on two separate counts of murder. He was tried by a Superior Court jury in August 1982 pursuant to a secret two-count indictment charging him with the murders of both Ronald Leone (count 1) and Rudy Baronet (count 2) on October 3, 1977. On September 2, 1982, the defendant was found guilty of murder in the first

degree on count 1 of the indictment and guilty of murder in the second degree on count 2 of the indictment.

After denying defendant's motion for a new trial, the trial justice sentenced him to life imprisonment for each murder conviction and ordered that these sentences be served consecutively.

The defendant raises four issues in support of his appeal. We find two of them to be dispositive of this case. Both involve defendant's assertion that his constitutional right of cross-examination guaranteed under the confrontation clause of the Sixth Amendment of the United States Constitution and under article 1, section 10, of the Rhode Island Constitution was violated by two specific rulings of the trial justice. The defendant contends that the denial by the trial justice of his motion to obtain certain medical records of the prosecution's key witness and the refusal of the trial justice to allow defense counsel to cross-examine this witness effectively on the issues of both bias and motive in testifying against defendant were both erroneous rulings that deprived him of his constitutional rights. We agree with both of these contentions and reverse defendant's conviction upon both grounds. The facts pertinent to this appeal are set out below.

At about 9:30 a.m. on October 3, 1977, Ronald Leone and Rudy Baronet left the Leone family residence in Johnston, Rhode Island, apparently to visit a friend. Neither has ever been seen or heard from since. Their disappearance was reported to the Johnston police department that same evening by Ronald's mother, Mrs. Josephine Pezzulli,[1] but neither man has ever been found.

In testifying to the factual circumstances surrounding the disappearance of Leone and Baronet, Janice Manfredi (Mrs. Manfredi),[2] the state's chief complaining witness, related the following.

In early October, 1977, Mrs. Manfredi was maintaining regular social contacts with defendant. At this time she was living at 33 Home Avenue in Providence, although she spent much of her time at defendant's apartment, which was located at 69 Mount Pleasant Avenue, Providence.[3] Sometime during the afternoon on October 2, 1977, defendant visited Mrs. Manfredi at 33 Home Avenue. He was carrying a black briefcase with him, and he requested that she keep it with her until such time as he needed it. Mrs. Manfredi agreed to take custody of the briefcase for defendant and had him place it in a closet located in the parlor of her home.

On October 2, 1977 Mrs. Manfredi spent the evening with defendant at his apartment on Mount Pleasant Avenue. She stayed there overnight with defendant, leaving her daughter with her roommate at 33 Home Avenue.

Mrs. Manfredi awoke the next morning at about eight o'clock. Before leaving for her home, defendant asked her to retrieve the black briefcase that he had delivered to her the previous day and bring it back to his apartment upon her return. Mrs. Manfredi went to her house to get her daughter ready to go to school. When she got there, she received a telephone inquiry from defendant. The purpose of defendant's phone call was to ascertain whether she had a sleeping bag at her home and, if so, to request that she bring it to him at his apartment after she had dropped her daughter off at school.

Mrs. Manfredi dropped her daughter off at school at about nine o'clock that morn-

---

**1.** On October 3, 1977, Mrs. Pezzulli's last name was Leone. On that date, she was living at her Johnston home with her former husband and three children. Ronald Leone was the eldest of her children.

**2.** At the time of the disappearance of Ronald Leone and Rudy Baronet, Mrs. Manfredi was divorced from her first husband and had yet to remarry. At that time, her name was Janice Costa, a name she apparently retained until her marriage to Anthony Manfredi in April 1981.

**3.** This structure is no longer standing, having been razed following a fire that took place after October 3, 1977.

ing. She returned to her car; but before proceeding on to defendant's apartment, she opened the briefcase that she had kept overnight for him and examined its contents. Upon looking inside, she found a silver gun and a pair of gloves. She closed the briefcase and then drove to defendant's apartment.

Mrs. Manfredi arrived at 69 Mount Pleasant Avenue a few minutes after nine o'clock. Upon her arrival, she carried the sleeping bag and the briefcase upstairs to defendant's second-floor apartment. She entered defendant's apartment and placed the briefcase and the sleeping bag in his parlor. She spoke briefly with defendant, and he instructed her to go home and then return in about an hour—defendant stated that the reason he asked her to leave for an hour was because "Ronnie Leone [was] coming to his house" and his visit related to business. Before leaving, Mrs. Manfredi observed that defendant's roommate, Dennis Roche, was also in defendant's apartment.

Mrs. Manfredi departed from defendant's apartment between 9:15 a.m. and 9:20 a.m. She went home, took a shower, and spoke with her roommate. She then left her Home-Avenue address and proceeded to a restaurant on Manton Avenue to pick up some donuts and coffee. She apparently ordered both items to go and immediately departed for 69 Mount Pleasant Avenue.

Mrs. Manfredi arrived back at 69 Mount Pleasant Avenue slightly more than an hour after her previous departure. She passed through the downstairs doorway through an unlocked door and proceeded upstairs to defendant's apartment. After she arrived at the second floor landing, she entered defendant's apartment, letting herself in through an unlocked parlor door. When she entered the parlor, Mrs. Manfredi did not see anyone. She began to walk towards the kitchen of the apartment, but halted at the threshold. From this vantage point, she could see both defendant and Dennis Roche in the kitchen and two bodies on the kitchen floor. She recog-

nized one of the bodies as that of Ronald Leone (someone she had known for some five or six months prior to this incident) but did not recognize the other one. She did, however, describe the second body as that of a young, teenage male.

Mrs. Manfredi described the face of Ronald Leone and that of the teenage boy as full of blood and stated that they both appeared to be dead. She observed that defendant was zippering up a sleeping bag with Ronald Leone inside and Dennis Roche was apparently pursuing a similar course of action with the body of the unknown teenager. She further noticed that the same silver gun and black briefcase that she had delivered to defendant earlier that morning were on the kitchen table and that the entire kitchen was "scattered with blood."

While she was standing at the threshold to the kitchen observing these events, defendant made the following remarks to her. Initially, defendant stated to her that he hoped she had "a strong stomach." Shortly thereafter, he further commented that what had happened "had to be done."

Dennis Roche and defendant subsequently removed the bodies from the Mount Pleasant Avenue apartment in Mrs. Manfredi's presence. They also placed the silver gun inside the black briefcase and removed it from their apartment. Before leaving their apartment, defendant had an additional request to make of Mrs. Manfredi. He asked her if she would stay and clean up the kitchen. This she agreed to do and therefore she remained in the apartment for one to one and one-half hours, scrubbing nearly the entire kitchen to remove the blood splattered all over it before defendant's return. Upon his return, Mrs. Manfredi questioned defendant about his disposition of the bodies. The defendant instructed her not "to worry about it—[t]hey're gone and [you should] forget it."

On December 4, 1981 Dennis Roche, defendant's roommate, was killed, thereby leaving Mrs. Manfredi the only remaining

person who knew of the events that allegedly occurred at 69 Mount Pleasant Avenue on October 3, 1977.

When she learned that Dennis Roche was dead, Mrs. Manfredi became quite scared and eventually went to the Providence police. On December 28, 1981, Mrs. Manfredi relayed the preceding scenario to Major Leyden, Captain Wilson, and Detective Giblin of the Providence police.

On March 9, 1982, a secret indictment was handed down by the Grand Jury of the State of Rhode Island charging defendant with the murders of both Ronald Leone and Rudy Baronet. On that same day, a warrant was issued for his arrest. The defendant was subsequently tried and convicted of both murders. The testimony of Mrs. Manfredi recounted above was successfully employed by the state in obtaining defendant's convictions on both murder counts.

The record indicates that defendant did testify at a suppression hearing which was held to determine the admissibility of a statement that he had made to the Providence police. The defendant elected not to take the stand, however, as is his right, at trial.

**I**

At trial, defendant attempted to introduce certain medical records of the state's chief complaining witness, Mrs. Manfredi. This attempt was made to establish that when Mrs. Manfredi allegedly saw the dead bodies of Ronald Leone and Rudy Baronet at 69 Mount Pleasant Avenue, she was a drug addict, who was undergoing detoxification for drug addiction and was therefore incapable of accurately perceiving, remembering, and communicating what she claims she saw. On a voir dire examination, defendant called Mrs. Mary Davies, assistant director of the medical records department at Roger Williams General Hospital, and requested that she reveal certain information contained in the medical records of

Mrs. Manfredi. Defense counsel apparently sought this revelation because he believed it would demonstrate that Mrs. Manfredi was "confined in the drug unit" at Roger Williams at the time she claims she witnessed these murders. The state objected to this line of questioning, and the trial justice sustained these objections upon the ground that this information was prohibited from disclosure under G.L.1956 (1976 Reenactment) § 5–37.3–4(a), as amended by P.L.1981, ch. 283, § 1.[4]

Defense counsel vigorously contested at trial the trial justice's denial of the admission of these medical records under the theory that defendant's constitutional right of cross-examination would be effectively denied. Specifically, it was his contention that the ruling of the Supreme Court in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) mandated the admission of these records under the Sixth Amendment. With this theory we agree.

We note at the outset that we have previously addressed this issue in the context of a child-abuse proceeding. In *State v. Anthony*, R.I., 440 A.2d 736 (1982), a defendant was charged with the murder of his infant daughter. In an attempt to prove that his wife, and not he, was responsible for the death of his daughter, the defendant caused to be issued a subpoena duces tecum upon the Department of Children and Their Families (DCF) to produce certain records that he contended would demonstrate his innocence.

The DCF moved to quash the subpoena upon the ground that disclosure was prohibited by §§ 5–37.3–1 through 5–37.3–10. The trial justice granted its motion, and the defendant was subsequently convicted of manslaughter. We reversed the defendant's conviction because (1) § 5–37.3–4(b)(4) provided a specific statutory exemption to the general-disclosure prohibition contained in the Confidentiality of Health Care Infor-

---

**4.** In general, this statute prohibits the release by a hospital of any information obtained by it in its treatment of a patient without that patient's consent. It is apparently undisputed that Mrs. Manfredi never consented to the disclosure of this information.

mation Act and (2) "the defendant's right to effective cross-examination, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by art. I, sec. 10 of the Rhode Island Constitution, [was] denied." *State v. Anthony*, 440 A.2d at 736–37.

In response to defendant's argument that *Anthony* controls our disposition of his appeal, the state cites three distinct reasons why we should not apply *Anthony* to the facts of this case. Specifically, the state contends that (1) we did not hold in *Anthony* that the Confidentiality of Health Care Information Act was unconstitutional, (2) a specific statutory exemption to the statute was present in *Anthony*, unlike in this case, and (3) the medical records sought in *Anthony* were necessary to show the cause of the victim's death and not to impeach the ability of a witness to perceive certain events. The state urges us not to reverse defendant's conviction based upon the state's perception of our prior pronouncements in *Anthony*.

Reviewing the state's three grounds for distinction, we note that its first two reasons are based upon the same implicit, albeit erroneous, assumption. The thrust of these first two arguments is that *Anthony* is not a constitutional case but rather is primarily based upon the specific statutory exemption provided for in § 5–37.3–4(b)(4).

Our response to these two arguments is that the actual language of *Anthony* previously quoted clearly demonstrates that the *Anthony* decision was based upon our finding of a constitutional violation of defendant's right to effective cross-examination. As further evidence of the fact that *Anthony* is a Sixth Amendment case, we would direct the state's attention to our more recent decision in *In re Board of Medical Review Investigation*, R.I., 463 A.2d 1373 (1983). Therein, we discussed our earlier holding in *Anthony*. We reiterated the point that the *Anthony* decision was based upon two separate grounds, including the fact "that the defendant's right to effective cross-examination was denied because the

information [he sought] may have been the defendant's only means of challenging testimony that led to his conviction." *In re Board of Medical Review Investigation*, 463 A.2d at 1375 (citing *State v. Anthony*, 440 A.2d at 736–37).

The third and final reason employed by the state to remove the disposition of this issue from the condemning sanction of *Anthony* is also without merit. In arguing that the medical records sought by defendant in *Anthony* were necessary to discover the cause of the infant girl's death and not to impeach the ability of a certain witness to perceive events about which she had testified upon direct examination, the state again ignores the clear import of the actual language we employed in *Anthony* as well as the facts of that case. In *Anthony*, we did not state that the sole effect of depriving the defendant access to the medical records he sought would be to deny him an opportunity to discover the cause of his daughter's death. Rather, we explicitly acknowledged the potential impeachment use of such records by the defendant in challenging testimony that resulted in his conviction. *State v. Anthony*, 440 A.2d at 736. To argue that *Anthony* is not an impeachment case in light of the fact that the defendant there sought through subpeona the medical records of the state's principal witness against him (his wife) is not tenable. It is our conviction that a primary use, if not the most important use, to which these records could have been put by the defendant in *Anthony* was to impeach the direct testimony of his wife. His wife's testimony had been offered to prove that he was responsible for his daughter's death.

Under these facts, if we accept the state's argument that the use of medical records to establish the cause of the infant's death in *Anthony* is factually distinguishable from the impeachment use here sought by defendant, we would distort the reality that the *cause of death* and the attempted *impeachment use through cause of death in Anthony* were both part

and parcel of the same theory of defense. This we will not do, for to do so would be to encourage a type of constitutional hair-splitting under the Sixth Amendment and art. I, sec. 10, that we perceive to be semantic at best.

■ For these reasons, we conclude that the mandate of *State v. Anthony*, R.I., 440 A.2d 736 (1982), is fully applicable to this appeal. The defendant was denied any access to medical records that may have been relevant in impeaching the testimony of the only surviving eyewitness to the crimes for which he was convicted. This total denial we find constitutionally violative of his fundamental right of cross-examination. *See* Id. 440 A.2d at 736–37. Although the right of confrontation afforded a criminal defendant under the Sixth Amendment and art. I, sec. 10, is not absolute, blanket denials of his access to "a certain class of evidence, even for the purpose of preventing a witness from suffering embarrassment on the stand, should not limit the Sixth Amendment right of a defendant to confront the witness against him." *Advisory Opinion to the House of Representatives*, R.I., 469 A.2d 1161, 1166 (1983) (quoting *State v. Howard*, 121 N.H. 53, 58, 426 A.2d 457, 460 (1981)).

We recognize that the Legislature, through the enactment of §§ 5–37.3–1 through 5–37.3–10, has sought to safeguard the integrity of confidential health-care information of all individuals.

> "But we do not believe that such an enactment, however beneficent it may be in other respects, can be allowed to abrogate the right of an accused to cross-examine thoroughly witnesses against him and thereby provide the jury with information which may affect its judgment on the ultimate issue of guilt or innocence." *State v. Myers*, 115 R.I. 583, 589, 350 A.2d 611, 614 (1976).

During oral argument the state requested that if this court should find a violation of defendant's right of confrontation as a result of the trial justice's denial of defendant's request for access to Mrs. Manfredi's medical records, we remand this case to the Superior Court for an evidentiary hearing to determine the relevance of this excluded evidence. The state prosecutor contended that neither he nor defense counsel knew what information was contained in these records and that defense counsel's offer of proof concerning the information that they contained was at most speculative. We acknowledge that we have previously adopted a similar course of action in an impeachment case involving the exclusion by the trial justice of the prior juvenile convictions of key state witnesses pursuant to a state statute barring their introduction. *See State v. Myers*, 115 R.I. at 592–93, 350 A.2d at 616.

■ We did not, however, follow such a procedure in *State v. Anthony*, R.I., 440 A.2d 736 (1982), nor have we employed such a device in cases in which we held that the trial justice erroneously restricted the scope of a defendant's cross-examination of the state's principal witness concerning the issues of bias or motive. *See State v. Freeman*, R.I., 473 A.2d 1149 (1984) and *State v. DeBarros*, R.I., 441 A.2d 549 (1982). This case more closely resembles *State v. Anthony*, R.I., 440 A.2d 736 (1982), than it does *State v. Myers*, 115 R.I. 583, 350 A.2d 611 (1976). It also involves erroneous restrictions upon the scope of the cross-examination of Mrs. Manfredi by defense counsel concerning her motive or bias in testifying against defendant. For these reasons, we will not remand this case for the evidentiary hearing suggested by the state.

II

On December 28, 1981, the same day that Mrs. Manfredi testified that she related her story to the Providence police, her husband, Anthony Manfredi, and another individual allegedly were arrested for a shooting incident involving the Providence police. Michael Manfredi, Anthony's brother, testified that the other individual involved in the shoot-out was charged with a crime.

He also testified, however, that his brother, who was on parole at the time, was released from the police station that same day without being charged with a crime for the incident and was never even brought to a violation hearing for his conduct. Upon confronting his brother and sister-in-law that day concerning the reason for Anthony's release, Michael testified that Mrs. Manfredi admitted to him that she had made up a story about defendant in order to get his brother off the hook.

As noted previously, Mrs. Manfredi testified under direct examination by the prosecutor that she went to the Providence police and was cooperating with law enforcement authorities because she was in fear of her own life after the death of Dennis Roche. During his cross-examination of Mrs. Manfredi, defense counsel attempted to explore the details and conditions underlying her enrollment in the federal witness protection program and her subsequent testimony at this trial. Of particular concern to him was the possibility that Mrs. Manfredi might have made a deal with the police to testify against defendant in this matter in exchange for their dropping all charges against her husband for his participation in the shoot-out.

The relevant excerpts from the cross-examination of Mrs. Manfredi by defense counsel are the following:

"Q. Did you make a deal concerning your husband?

"A. No.

"Q. As part of this protection—you didn't?

"A. No, I didn't.

"Q. Did you know that two weeks prior to this incident, that your husband and a fellow named Moose, had been arrested?

MR. GEMMA: Objection.

"Q. Did you know that?

MR. GEMMA: Objection, your Honor.
THE COURT: Sustained. Disregard the question, ladies and gentlemen.

"Q. Well in making a deal with the authorities, did you tell them you wanted to make a deal so some charges that were

outstanding against your husband wouldn't be pursued by the police?

"A. No, I did not.

\* \* \* \* \* \*

"Q. When you made the deal with the police, did you ask them about your husband?

MR. GEMMA: Objection, your Honor, as to the word "deal."

\* \* \* \* \* \*

THE COURT: Sustained.

"Q. When you had the assurance from the police, and from Mr. Gemma that you were protected, and would be protected, you inquired about your husband, naturally, didn't you?

"A. That's right.

"Q. And you wanted to know at that time—was your husband a parole violator?

MR. GEMMA: Objection.

"A. No.

THE COURT: Sustained.

\* \* \* \* \* \*

THE COURT: Strike the answer, ladies and gentlemen."

In response to defense counsel's argument that the evidentiary rulings by the trial justice impinged upon defendant's right to impeach the credibility of Mrs. Manfredi, the trial justice responded that defense counsel had "the wrong witness for this type of information * * * [you] [c]an't get it in through her."

The appropriate point from which we commence our analysis of defense counsel's claim that his cross-examination of Mrs. Manfredi was unduly restricted is a discussion of the fundamental right of a criminal defendant to confront his accusers under the Sixth Amendment of the United States Constitution. "Embodied in this guarantee is a defendant's right to cross-examine the prosecution's witnesses as well as to present witnesses of his own." *State v. Freeman,* 473 A.2d at 1153 (citing *Pointer v. Texas,* 380 U.S. 400, 403–04, 85

S.Ct. 1065, 1067–68, 13 L.Ed.2d 923, 926 (1965)). The right of cross-examination is guaranteed to a criminal defendant because "[i]t is the principal means by which the credibility of the witness and the truthfulness of his testimony can be tested." *State v. Anthony,* R.I., 422 A.2d 921, 924 (1980) (citing *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974)).

■■■ We have previously implied that this right should be vigilantly guarded when a defense counsel challenges the scope of cross-examination that he was afforded by a trial justice in his questioning of the prosecution's sole eyewitness to an alleged crime. In *Freeman* we reversed the defendant's conviction for voluntary manslaughter where "the state's key witness * * * was the sole eyewitness to the events immediately preceding [the victim's] death." *State v. Freeman,* 473 A.2d at 1153. In that case, we stated that the status of the complaining witness as the sole eyewitness to the events immediately preceding the victim's death was sufficient in and of itself to make her credibility the "pivotal element" in the state's case against defendant. *Id.* We held in *Freeman* that once this vital element is established, the trial justice may not totally prevent the defendant from exploring the issues of motive, bias, or prejudice in the testimony of the state's chief witness. If the trial justice does so, he or she commits an error of constitutional magnitude under both the Sixth Amendment to the Constitution of the United States and art. 1, sec. 10, of the Rhode Island Constitution. *Id.* 473 A.2d at 1154.

Similarly, in *State v. DeBarros,* R.I., 441 A.2d 549 (1982), we held that a trial justice has no discretion at all under the confrontation clause to completely prohibit defense counsel from attempting to elicit testimony from a crucial witness to demonstrate bias upon his part. Under these circumstances, the Sixth Amendment right of confrontation is violated.

"Such a right may not be given or withheld at the discretion of the trial justice. '[The] discretionary authority to limit cross-examination comes into play [only] after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment.' *Springer v. United States,* 388 A.2d 846, 855 (D.C.App.1978) (quoting *United States v. Bass,* 490 F.2d 846, 857–58 n. 12 (5th Cir.1974))." 441 A.2d at 552.

■■■ Our holdings in *Freeman* and *DeBarros* demonstrate that we have adopted a per se error rule in reviewing cases in which a trial justice totally precludes cross-examination by defense counsel of the state's key witness on the issues of motive or bias. *State v. Freeman,* 473 A.2d at 1154; *State v. DeBarros,* 441 A.2d at 552. Total preclusion of this type results in constitutional error irrespective of any attempted justification by the state for the rulings of the trial justice. In these cases, we do not even address the question of whether such error is harmless because we are convinced that a defendant is entitled to present his theory of bias or motive to the jury. In this regard we reaffirm our reliance upon the pronouncements of the Supreme Court in *Davis* in adhering to a per se error rule:

"We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [that witness's] testimony * *." *Davis v. Alaska,* 415 U.S. at 317, 94 S.Ct. at 1111, 39 L.Ed.2d at 354.

Reviewing the excerpted testimony highlighted above, we find that the scope of cross-examination afforded defendant in this case was not broad enough to require that we apply a different error rule than the per se standard that we have previous-

ly adopted.[5] It is clear that defense counsel was permitted to ask Mrs. Manfredi if she had made a "deal" with the authorities concerning pending criminal charges against her husband. When faced with her denial of such an agreement, however, defense counsel was totally precluded from exploring more particular areas of inquiry. Such an inquiry may have demonstrated that she had offered testimony against defendant, not out of fear for her own life, but rather out of her desire to keep her husband out of jail. Of the handful of questions asked by defense counsel to establish this latter motive as the reason for Mrs. Manfredi's testifying, she was never required to answer the two most potentially damaging ones [6]—those whose affirmative responses would have seriously weakened the veracity of her general denial. These questions, directly relating to her husband's alleged involvement in a shoot-out with the Providence police, were never answered by Mrs. Manfredi because the trial justice sustained the state's objections to the both of them. By so doing, the trial justice prevented defendant from employing effective means to impeach the credibility of the sole living eyewitness to defendant's alleged crimes.

 Viewed in its entirety, therefore, we find that although defense counsel was not totally precluded from making general inquiries of Mrs. Manfredi to demonstrate that the real reason she testified against the defendant was to protect her husband, the scope of cross-examination that defense counsel was afforded by the trial justice was so limited in degree as to be insufficient under the Sixth Amendment and art. 1, sec. 10. As we stated in *DeBarros*, the fact that a trial justice has allowed defense counsel some cross-examination on the issue of bias is not dispositive of his allegation of a denial of his right to confront his

---

**5.** Even were we to conclude that the scope of cross-examination afforded defense counsel on the issue of bias or motive was sufficient to avoid our application of a per se error rule, it is beyond question that we would still find that the fundamental right of defendant to cross-examine his accusers was violated. In *State v. DeBarros*, R.I., 441 A.2d 549 (1982), we adopted the second prong of the standard of review announced in *Springer v. United States*, 388 A.2d 846, 856 (D.C.App.1978), to be applied in analyzing cases involving a restriction of a requested line of bias cross-examination. Only if we believe that the effect of such restriction was harmless to a defendant will we not find a constitutional violation.

"'To hold harmless such error in curtailing constitutionally-protected cross-examination, it must be clear beyond a reasonable doubt "(1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony."' *Springer v. United States*, 388 A.2d at 856." *State v. DeBarros*, 441 A.2d at 552.

A brief review of the record demonstrates that the restrictions imposed by the trial justice in this case were not harmless beyond a reasonable doubt. Mrs. Manfredi was the sole eyewitness to events immediately surrounding the alleged murders of Ronald Leone and Rudy Baronet. For over four years their disappearance remained an unsolved mystery to their families and to the local police. The detailed and graph-

ic description that Mrs. Manfredi gave of the events just preceding and following the two murders formed the crucial evidence in the state's case. Under these facts, we cannot say beyond a reasonable doubt that defendant would have been convicted without the testimony of Mrs. Manfredi.

Likewise, the second element in the *Springer* disjunctive test for harmless error would mandate a finding in defendant's favor. If defense counsel had been permitted to demonstrate that Mrs. Manfredi knew that her husband had been involved in a shoot-out with the Providence police, thereby violating his parole, before she went to the Providence police, her statements on direct examination about her reasons for testifying against defendant would have been weakened. Mrs. Manfredi affirmatively denied that she had made any deal with the authorities to dispose of pending charges against her husband and stated that fear for her own life caused her to go to the police. If defense counsel had been able to impeach her credibility upon this issue, it is our opinion that the overall impact of her testimony would have been diminished. Consequently, we cannot find that the error resulting from the restriction of defense counsel's cross-examination in this area was harmless beyond a reasonable doubt. *State v. DeBarros*, 441 A.2d at 552.

**6.** These questions were (1) defense counsel's inquiry concerning Anthony Manfredi's recent arrest and (2) his further inquiry about Anthony Manfredi's status as a parole violator.

accusers. Before any discretionary authority arises in the trial justice to curtail the scope of cross-examination, the defendant must be provided, not just some cross-examination, but *sufficient* cross-examination as a matter of right. *State v. DeBarros,* 441 A.2d at 552. Since this degree of latitude was not afforded defense counsel in this case, we find a per se violation of the defendant's constitutional right of cross-examination under the Sixth Amendment of the Constitution of the United States and art. 1, sec. 10, of the Rhode Island Constitution. *See State v. Freeman,* 473 A.2d at 1154; *State v. DeBarros,* 441 A.2d at 552.

For the reasons stated, the defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the case is remanded to the Superior Court for a new trial on both counts.