**STATE**

v.

**Luigi MANOCCHIO.**

**84–43–C.A.**

Supreme Court of Rhode Island.

Aug. 6, 1985.

Arlene S. Violet, Atty. Gen., Thomas Dickinson, Sp. Asst. Atty. Gen., for plaintiff.

John A. MacFadyen, III, Providence, for defendant.

## OPINION

KELLEHER, Justice.

On April 20, 1968, Rudolph Marfeo and Anthony Melei were shot to death while shopping at a Pocasset Avenue market in Providence. This appeal represents yet another chapter in the lengthy and persistent effort to bring those responsible for these murders to trial.[1] Defendant Luigi Manocchio (Manocchio) was indicted in August of 1969 on two charges of accessory before the fact and one charge of conspiracy to commit murder. He evaded arraignment and prosecution for ten years by fleeing the jurisdiction. *State v. Manocchio,* R.I., 448 A.2d 761, 763 (1982). Manocchio was

---

1. Originally, seven persons were indicted for activities connected with these murders (indictments numbered 69–767, –768, and –769 returned on August 14, 1969). In the three trials preceding this defendant's arraignment, Maurice Lerner was found guilty of first-degree murder and conspiracy to commit murder. John Rossi, Robert Fairbrothers, Raymond Patriarca, and Rudolph Sciarra were also found guilty of conspiracy but not guilty of charges of accessory before the fact. The conspiracy charge against Frank Vendituoli was dismissed, and he was found not guilty of accessory charges. *See State v. Lerner,* 112 R.I. 62, 308 A.2d 324 (1973), and *State v. Patriarca,* 112 R.I. 14, 308 A.2d 300 (1973).

finally arraigned on July 6, 1979, and in June of 1983 a Superior Court jury found him guilty of all three charges. Manocchio now appeals his convictions on a multitude of grounds. We reverse because we have determined that the trial justice impermissibly limited Manocchio's cross-examination of a key witness.

Melei and Marfeo were killed by two masked gunmen, allegedly in retaliation for running a gambling operation that competed with a similar enterprise run by another defendant, Raymond L.S. Patriarca (Patriarca). The state's case against all of the original defendants, including Manocchio, was based almost entirely on the testimony of participant-turned-informer John J. "Red" Kelley (Kelley). Before the grand jury that indicted the defendants, and again at the various trials of the various defendants, Kelley detailed a series of meetings with the other participants in the crime designed to firm up plans for the murder itself and for the subsequent getaway. Kelley's own avowed role in the crime involved reconnaissance, purchasing masks for the gunmen, preparing weapons, and planning an escape route.

At the time of Manocchio's trial, Kelley was sixty-eight years old, testifying about events that had occurred fifteen years previously. Defense counsel was therefore understandably concerned about Kelley's present ability to remember and relate accurately the circumstances surrounding Manocchio's alleged involvement in the two murders. Counsel's apprehension grew when Kelley testified in the following fashion at an identification-suppression hearing:

"Q. Mr. Leppo [defense counsel:] Are you suffering from any disease that affects your memory?

"A. Yes. Yes. [Witness starts to cry.]

" * * *

"Q. Would you tell us what disease you have that affects your mind and memory?

"A. I have—I'm, I'm being treated for many different things, and premature Alzheimer's, I think it is.

"Q. And does that affect your memory, sir?

"A. Yes, it does.

"Q. And does that affect your thought process?

" * * *

"A. It does.

" * * *

"Q. Has that affected your recall as to certain events?

"A. It does affect it, yes.

"Q. And how often does this happen?

"A. When I tell you I can't remember a thing, it's an honest answer."

At the conclusion of the suppression hearing, Manocchio moved to have Kelley examined for competency. The trial justice stated: "[W]e heard him testify. The Court rules as a matter of fact, after hearing this gentleman testify, he is competent."

Subsequently, at trial, Manocchio sought to explore Kelley's memory problems and mental diseases for the benefit of the jury. Each time counsel broached this subject, however, he found inquiry foreclosed when the trial justice sustained the prosecutor's objections.

"Q. [Mr. Leppo:] Now, yesterday you told us you were taken to the House of Corrections in New Bedford. Do you remember saying that yesterday?

"A. [Kelley:] I don't recollect that.

"Q. You don't recollect saying New Bedford yesterday?

"A. I don't recollect now.

"Q. Do you have a problem with your memory?

"A. Yes, I do have a problem with my memory.

"Q. And the problem with your memory is that you cannot remember saying Thursday what you said on a Wednesday, sir?

MR. LEACH [the prosecutor:] Objection, Your Honor.

THE COURT: Sustained.

"Q. Do you have a problem with your memory you cannot remember what you said to me two questions ago?

"A. Yes, I do.

"Q. So that if I were to ask you to repeat your answer as to where you went with Mr. Rico, you would have forgotten that answer?

MR. LEACH: Objection, Your Honor.

THE COURT: You may answer.

"A. That's a possibility.

"Q. So that you have difficulty with that memory?

"A. I do.

"Q. And that memory, sir, has been failing you for some period of time now, is that correct?

MR. LEACH: Objection, Your Honor.

THE COURT: Sustained.

"Q. Has that memory been failing you?

MR. LEACH: Objection, Your Honor.

THE COURT: Sustained.

"Q. How long have you suffered from that condition, Mr. Kelley?

MR. LEACH: Objection, Your Honor.

THE COURT: Sustained."

Thus, the only evidence Manocchio was allowed to place before the jury regarding Kelley's mental condition was that Kelley had a "problem" with his memory. Kelley's premature Alzheimer's disease and the "many different things" for which he had previously revealed he was being treated were never revealed to the jury. Manocchio's quandary was compounded by Kelley's only recently abandoned participation in the federal witness-protection program. Kelley had been given a new identity through the program and had been relocated to an undisclosed area. Thus, Manocchio's only hope for acquiring information about Kelley was through the use of cross-examination.

At the conclusion of the evidence, the jury returned verdicts of guilty on all three charges. The trial justice sentenced Manocchio to a life sentence on each of the accessory counts and a term of ten years on the conspiracy count, all sentences to be served consecutively.

On appeal Manocchio raises several issues relating to alleged errors before the grand jury and at trial. We find it unnecessary, however, to inquire further than the trial justice's unwarranted restriction of defense counsel's cross-examination of Kelley on the issue of Kelley's memory deficiencies and mental diseases. Manocchio argues that by so limiting his ability to cross-examine Kelley, the trial justice denied Manocchio the right to confront his accusers guaranteed by both the Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment and article I, section 10, of the Rhode Island Constitution. We agree.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." [2] Included within the rights conferred by the confrontation clause is, primarily, the right of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353 (1974); *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934, 937 (1965). In *State v. Anthony*, R.I., 422 A.2d 921, 924 (1980), we observed: "It is the essence of a fair trial that reasonable latitude be given the cross-examiner." While it is true that the trial justice must exercise his or her discretion to protect a witness from questions that "harass, annoy, or humiliate the witness, or questions that are irrelevant or offer no probative value," *id.*, we have clearly endorsed the principle that this discretionary authority to limit cross-examination "comes into play [only] after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment." *State v. DeBarros*, R.I., 441 A.2d 549, 552 (1982) (quoting *Springer v. United States*, 388 A.2d 846, 855 (D.C.App.1978)).

**2.** In pertinent part the Rhode Island constitutional provision is identical.

Thus, in *DeBarros* and *State v. Freeman*, R.I., 473 A.2d 1149 (1984), we clearly established a per se error rule where the defendant has been fully precluded from effective cross-examination on a pertinent issue. We have also relied on the per se standard where a defendant has been permitted to ask preliminary questions but has been otherwise functionally precluded from constitutionally adequate cross-examination. *State v. Parillo*, R.I., 480 A.2d 1349, 1357 (1984). In *Freeman* defense counsel was blocked on cross-examination from eliciting from the only eyewitness to the victim's murder that at the time she gave a statement to police concerning the murder, she was in custody and under arrest. We held that because the witness's credibility

"was the vital element in establishing the defendant's guilt, the trial justice, by totally precluding the defendant from raising and probing the issues of motive, bias, or prejudice, effectively cut off the defendant's right to test [the witness's] credibility fully and adequately." *State v. Freeman*, R.I., 473 A.2d at 1154.

In *Parillo* defense counsel sought to cross-examine the sole living eyewitness to the victims' murders about a deal she allegedly made with the police in exchange for her testimony. Defense counsel was allowed to ask several preliminary questions but was then foreclosed from further substantive inquiry. We held that a defendant must be afforded "not just some cross-examination, but *sufficient* cross-examination as a matter of right." (Emphasis in original.) *State v. Parillo*, R.I., 480 A.2d at 1359. We thus applied the per se error standard and vacated the defendant's conviction even though counsel had not been completely foreclosed from inquiry.

With these cases for guidance, we find ourselves in sharp disagreement with the state's assertion that the few preliminary questions permitted by the trial justice sufficiently apprised the jury of the state of Kelley's mental faculties. At best, we believe these questions served merely to pique the jury's curiosity, providing no basis from which to infer the nature or extent of Kelley's "problem with [his] memory." We are persuaded that the four questions posed by defense counsel and answered by Kelley do not satisfy the constitutional requirements for adequate cross-examination.

While it is true that the case presently before us does not involve the traditional impeachment areas of motive or bias, we have concluded that the rationale supporting our holdings in those cases is equally compelling with respect to cross-examination aimed at exploring competency. We have pointed out that the purpose of cross-examination is to test for the benefit of the jury "the credibility of the witness and the truthfulness of his [or her] testimony * *." *State v. Anthony*, R.I., 422 A.2d at 924. It is axiomatic that the ability of a witness to remember accurately and to relate the events in question is of crucial importance to a jury's assessment of that witness's credibility. Where counsel is able to demonstrate that through either passage of time or an intervening mental disease the witness is incapable of recollecting the events in question, or of distinguishing fact from fiction, the most essential element of the witness's value and reliability has been destroyed.

In the case presently before us, an exploration of Kelley's possible memory defects was especially warranted. When Kelley took the witness stand before the jury that convicted Manocchio, he was the only witness who could link Manocchio with the fifteen-year-old murders of Melei and Marfeo. It is readily apparent to us that Kelley's credibility was the only real issue before the jury. As the state's only witness with the ability to detail Manocchio's participation in the murders, the jury's determination of whether or not to convict him rested entirely upon its assessment of Kelley's competency and veracity.

In addition, this was at least the fourth time since the murders had occurred that Kelley had been required to relate his story

under oath,[3] admitting for the first time on the eve of Manocchio's trial that all of his prior testimony had been tainted in significant respects with perjury. There was an obvious danger here that Kelley's testimony involved far more recitation than recollection.

For these reasons, we find in line with our prior case law that the trial justice's limitation of cross-examination on the issue of Kelley's memory deficiencies and mental diseases was clear error, violating both Manocchio's Sixth Amendment right to confront the witnesses against him and art. I, sec. 10, of the Rhode Island Constitution.

Manocchio's appeal is granted, and the judgments of conviction appealed from are vacated. The papers in this case are remanded to the Superior Court for a new trial on all counts.

The Chief Justice participated in the oral argument and in the decision of the court, but he did not participate in the publication of the formal opinion.

---

**3.** Kelley testified before the grand jury that returned these indictments and at the three previous trials of the other defendants.