STATE *vs.* WILLIAM HENRY CROUGH.

JULY 1, 1959.

PRESENT: Condon, C. J., Roberts, Paolino, and Frost, JJ.

PAOLINO, J. This is a statutory short form indictment in two counts charging that the defendant (1) "on, to wit, the eighteenth day of November in the year of our Lord one thousand nine hundred fifty-five * * * did murder one Deborah Conlon"; and (2) "between the twelfth day of November * * * and, to wit, the twenty-first day of November * * * did murder one Deborah Conlon." The indictment was returned in April 1957 and thereafter the defend-

ant was convicted by a jury in the superior court of manslaughter. His motion for a new trial was denied. The case is before us on his exceptions to such denial and to certain rulings by the trial justice relating to the admission and exclusion of evidence, to his refusal to charge as requested, to certain portions of the charge, and to the denial of the defendant's motions for a directed verdict in his favor as to murder in the first degree and as to murder in the second degree.

The defendant has briefed his exceptions under four main points, and we shall treat such exceptions in the same manner but not necessarily in the same order.

The evidence discloses that at the time of the trial in November 1957 defendant was thirty-one years of age. After serving in the United States Navy for two and one-half years, he received an honorable discharge in 1945. Sometime thereafter he served a prison term in Massachusetts for robbery and was freed on parole in 1952. He came to Rhode Island from Massachusetts in 1955 and lived for a while with a married sister. Later on he met Mrs. Beatrice Conlon, the mother of Deborah Conlon. After leaving his sister's house he went to live with Mrs. Conlon and her three children, Deborah, aged four years, and two boys aged six and twelve years.

The defendant testified that he and Mrs. Conlon lived together as man and wife; that he acted as head of the household; and that they intended to get married on January 21, 1956. Mrs. Conlon testified that they began living together as man and wife in July 1955. It is undisputed that he lived with Mrs. Conlon and her three children up to November 18, 1955. However, after a preliminary hearing on the question of whether a common-law marriage existed between the parties, at which Mrs. Conlon was represented by her own counsel, the trial justice found that she had failed to establish a common-law marriage. The defendant has briefed his exception to such finding un-

der point II. In our opinion there is evidence in support thereof and therefore the trial justice was not clearly wrong in so finding. We shall treat the case accordingly.

The house in which they lived was located on Mishnock road in the town of West Greenwich. It appears from the evidence that when the two boys returned from school on November 17, 1955, about 4 p.m., they asked defendant about Deborah and he told them she was in bed because she was not feeling well. He also told this to Mrs. Conlon when she returned home from work about 5 p.m., although he later stated that he then knew the child had been dead since approximately 3:30 p.m.

On the following morning the two boys went to school and Mrs. Conlon went to work without having seen Deborah. When she returned home that evening she found a note in defendant's handwriting in the kitchen. This note is in evidence as state's exhibit 1 and stated in substance that defendant and the child had gone to Boston and that they would be back on the following day.

On November 19, 1955 Mrs. Conlon went to the Hope Valley state police barracks and showed the patrol commander the note. After reading it he and another trooper went to her house and searched the premises. The child's body was found in a shed in the back yard wrapped in a bedspread with a piece of paper on top of it. Thereafter, upon the arrival of the medical examiner, pictures were taken and the contents of the piece of paper, which is now state's exhibit 4, were read. The child's body was then removed to the state morgue where the medical examiner performed an autopsy. Exhibit 4 reads as follows:

"Bea
"I dont know how to tell you. I'm so very sorry.
"Yesterday I took debby out back on the swing and she fell on the wooden horse on her stomach it got awful black & blue.

"She seemed ok for a while then *nothing*. I tried so hard to help by giving artificial respiration & breathing in her mouth.

"Honey she's dead

"They'll blame me I know with my record. I have to leave. You'll hate me now, and I was so happy with you & the kids.

*"I Love You Bea*

*Bill"*

On August 20, 1957 defendant was arrested by the F. B. I. in Chicago, Illinois. He told them that the child's death was accidental and he wrote and signed a statement, a copy of which is in evidence as state's exhibit 15, in which he described the events of November 17, 1955 substantially as he had done in exhibit 4. He described the accident as having happened at about 1:30 p.m. and stated that she stopped breathing about 3:30 p.m. He also described what he did to help the child and the events which culminated in placing her body in the shed, in his writing the two notes, and in his leaving the state.

The defendant waived extradition and was taken back to Rhode Island by Captain Cassidy and Trooper Willard F. Partington of the Rhode Island state police. They took him in custody at about 3 p.m. on August 29, 1957 and entrained for Providence at about 4 p.m. Trooper Partington testified that when they were on the train about a half hour out of Chicago the defendant stated that the child's death happened as he had described it in exhibit 15, but that later the trooper told defendant he could not believe that story and wanted to know what actually took place on November 17, 1955. The trooper testified that at that point defendant said: "Look, you fellows have used me all right. * * * I've been living with this thing for almost two years now. * * * I want to get it off my chest." Then defendant made a statement to them which was materially different from what he had written in exhibits 4 and 15. This statement was subsequently reduced to writing when

they arrived at the state police headquarters in Lincoln, Rhode Island, at about 2:10 p.m. on August 30, 1957.

At the Lincoln barracks defendant personally wrote and signed a statement which is in evidence as state's exhibit 13. He also signed another statement, which is in evidence as state's exhibit 14, and which was typed by the state police. In exhibit 13 defendant put in writing the second story which he had given the state troopers on the train. Exhibit 14 consists of questions by the state police relative to statements appearing in exhibit 13 and defendant's answers to such questions. This exhibit is substantially an elaboration of defendant's statements made in exhibit 13. These statements were both signed in the afternoon of August 30, 1957, about 3 p.m. On the following day he was brought to court for arraignment.

The state's offer of exhibits 13 and 14 as evidence was objected to by defendant on the ground that the state had not established that they had been freely and voluntarily made, but defendant did not request a preliminary hearing on this issue. He merely reserved the right to move to strike such exhibits after the conclusion of the cross-examination of Trooper Partington, the witness through whom the state sought to introduce such exhibits. Before admitting them in evidence the trial justice permitted extensive examination of the witness, in the presence of the jury, concerning the circumstances surrounding the making and execution of the statements.

Trooper Partington testified that he was with defendant continuously from the time he was taken in custody in Chicago until he signed exhibits 13 and 14; that no promises, threats, force, or pressure of any kind were used to obtain the statements; that defendant was not misled in any way; that he witnessed the making and execution of exhibits 13 and 14; and that defendant freely and willingly made the oral statement on the train and the written statements in

exhibits 13 and 14. On the basis of such testimony the trial justice admitted the exhibits in evidence.

Under point I (A) defendant contends that the trial justice erred in so doing. There is no merit in this contention. The only evidence before him was the uncontradicted testimony of trooper Partington that defendant's statements had been freely and voluntarily made. In our opinion on the basis of the record the trial justice was warranted in permitting said exhibits to be introduced in evidence.

After the introduction of the exhibits, defendant's counsel was given wide latitude in cross-examining the witness concerning all circumstances connected with the making of the oral statement on the train and the making and execution of exhibits 13 and 14. After completing his examination of the witness, and without presenting any other evidence in rebuttal on this issue, defendant's counsel moved to strike exhibits 13 and 14. The trial justice denied this motion. The defendant's exception to such ruling is equally without merit. It is clear from the testimony at this point that the only evidence before the trial justice was the uncontradicted testimony of the state's witness that defendant had volunteered the statement on the train and that no promises, threats, unlawful influence or pressure had been exerted to induce the making of that statement or the statements contained in exhibits 13 and 14.

In exhibits 13 and 14 defendant described the events of November 17, 1955 in substance as follows. He stated that after Mrs. Conlon's two boys had departed for school he brought Deborah to bed with him as was a frequent practice; that she was a very affectionate child and liked to be near him; that the child wet herself; that he got very mad and lost control of his temper; that he slapped her very hard and kicked her out of bed; that he hit her again in the stomach with his fist or hand; and that he did not remember how many times he slapped her. He also related what he did to help the child; that her stomach was very

red; and that he picked her up in his arms, put her pajamas on and placed her in bed. He stated that this happened around 10:30 or 11 a.m.

He described in said exhibits how she kept asking for something to drink; that he gave her some hot chocolate which she spit up; that he got scared and did not know what to do; that she started to gasp, her eyes froze and her breathing stopped; and that he started breathing into her mouth three or four minutes and then he realized she was dead. He also described what happened when the two boys and Mrs. Conlon came home that day and what he did on the following morning. He admitted writing the two notes, exhibits 1 and 4, and he related how he transferred the child to the shed. He also stated that the statements in exhibit 13 were true and those in exhibit 15 were not the truth. He stated that he did not make any effort to get medical aid or other help and that he went away because no one would believe him on account of his record.

The medical examiner testified that in his opinion the child died as the result of blunt injuries to her abdomen; that these injuries resulted from several forces applied to the body; that a blunt injury is an injury caused by something striking the body, or the body striking something else, which does not cut or tear the surfaces of the body, namely, the skin, and causes injury and tearing or breaking of parts inside the body; that the child lived approximately twelve hours after she received the blunt injuries; and that she died about 9 p.m. on November 17, 1955.

At the trial defendant testified that the child's death was accidental and that it happened just as he said it did in exhibits 4 and 15. His testimony corresponded substantially with the statements he had previously made in those exhibits. He repudiated the statements contained in exhibits 13 and 14 and the statement he had made to Captain Cassidy and Trooper Partington on the train. He testified that on the train Captain Cassidy had shown him the

indictment charging him with murder, and had commented that there were a lot of women's names on it and the state would make sure there would be a lot of women on cases such as his.

He also testified that on the train Trooper Partington told him that two men who had served time with him in Massachusetts were looking for him and that one of them wanted to kill him; that the trooper also said that he had seen Mrs. Conlon and she would go to pieces if she had to go through a trial and see the pictures the state had taken; and that the state would dig up the body again.

The defendant testified that up to the time this discussion took place he had not changed his story that the death of the child was accidental; that he then stated he wanted to see a lawyer before he said anything else; that Trooper Partington then said: "Let's not have any of that stuff"; that that was about the end of the conversation except that defendant said: "If that's the way it is, * * * Okay I'll give you a statement"; and that the only reason he made the statement was because of the foregoing discussion. The defendant stated that he decided to run away because he could not stand the look on Mrs. Conlon's face when she found out that the little girl was dead and also that because of his record he did not think the police or anyone else would believe anything he told them.

It appears from the evidence that Trooper Partington had already testified that the indictment had not been shown to defendant; that the question of disinterment of the body had never been mentioned; and that he did not say that Mrs. Conlon would have to go through an added burden of grief unless defendant changed his story. He also stated that none of these things had been said or done by anyone in his presence. However, the trooper testified that the oral statement, which was subsequently reduced to writing in exhibits 13 and 14, was made by defendant as the train was coming out of New London, Connecticut,

heading towards Providence; that after such statement was made defendant had brought up the discussion about the two convicts; that he asked Trooper Partington where they were; and that he told the trooper he was scared of them. However, the trooper denied saying that if defendant did not change the story about what happened to Deborah he would go back to the Massachusetts prison where one of the convicts was confined.

The defendant has briefed and argued together several exceptions to rulings of the trial justice permitting a state's witness to testify that defendant had willingly executed exhibits 13 and 14 and that no pressure was used to induce the same. The defendant's contention that such questions were leading, or that they called for conclusions or opinions rather than for a statement of facts, is without merit. The transcript clearly shows that after stating in detail the circumstances surrounding the making and execution of the statements in question, the state's attorney in direct examination asked the witness whether they were freely and voluntarily made and executed and whether any pressure had been used to induce defendant to make such statements. The witness had already testified that defendant volunteered the statements and that no promises, threats, or coercion had been made. In our opinion the rulings were not in error.

We have examined defendant's exceptions relating to his contention that the trial justice committed prejudicial error in sustaining the state's objections to certain questions put to defendant by his counsel concerning the circumstances surrounding the making and execution of exhibits 13 and 14. We agree that an accused in a criminal proceeding is entitled to wide latitude to show all the circumstances surrounding the making and execution of a confession so that it can be determined whether the confession is voluntary and free from unlawful pressure. We have carefully examined the transcript with this rule in mind and we are

convinced that defendant was allowed wide latitude for such purpose by the trial justice. In our opinion he did not abuse his discretion and his rulings were not prejudicial.

There is no merit in defendant's contention that the trial justice erred in refusing to permit him to introduce the copy of the indictment which defendant testified Captain Cassidy had shown him on the train. This clearly was not material on the issue of admissibility of exhibits 13 and 14, since they were already in evidence and defendant's motion to strike had already been denied. Said copy could serve no other useful purpose since the original indictment was part of the record.

The defendant testified that on the train he requested a lawyer and received no response from the troopers. He gave this testimony after exhibits 13 and 14 were in evidence and after the motion to strike had been denied. He now contends that his constitutional rights have been denied. In the circumstances of this case we cannot agree with this contention. There is no evidence of unnecessarily prolonged incarceration or questioning of defendant by authorities of this state. It is undisputed that he was in the custody of Rhode Island authorities only for the time necessary to transport him from Chicago to this state and that he was arraigned on the day after his arrival. In our opinion such arraignment was reasonable and in compliance with general laws 1956, §12-13-2.

It is well settled that a confession made to an officer in charge of a prisoner, if voluntary, is just as admissible as if made to any other person. *State* v. *Nagle,* 25 R. I. 105, 111. Even assuming the truth of defendant's testimony that on the train when he asked for counsel he was refused, in view of the fact that he thereafter made the statements in question it is our opinion that in the circumstances he was not denied due process and that the trial justice did not err in admitting the statements on that account. *State*

350

v. *Hofer,* 238 Iowa 820; *James* v. *State,* 193 Md. 31; *State* v. *Murphy,* 87 N.J.L. 515.

We have considered defendant's arguments under point I concerning his testimony and that of his sister relating to their version of the reason why defendant made the statements contained in exhibits 13 and 14. We wish only to point out that this testimony was presented after such exhibits were already in evidence and after a proper foundation for their introduction had been established. Thereafter it became the duty of the jury to weigh and evaluate such testimony under proper instructions by the court so that they could determine whether to give credence to the state's witnesses or to those for defendant and thus ultimately decide whether such statements were freely and voluntarily given according to law.

Under point I (B) defendant contends that the trial justice erred in refusing to grant certain of his requests to charge relating principally to the issue of whether the statements contained in exhibits 13 and 14 were voluntary and free of improper influence and pressure. In his charge the trial justice referred to the oral statement made on the train and also to exhibits 13 and 14. He charged in substance that before the jury could consider such statements, oral or written, they must find that defendant made them freely of his own volition and not because of threats, promises, inducements or compulsion. After carefully reading the requested instructions in relation to the charge as given, we are satisfied that such requests, in so far as they state the law correctly on the basis of the evidence presented, have been substantially covered in the charge given by the trial justice. We are likewise convinced that the instructions given were an adequate and correct statement of the law and applicable to the evidence before the jury. *State* v. *Smith,* 70 R. I. 500, 514. We have considered defendant's other requests to charge and also find them lacking in merit.

We do not agree with defendant's contention that the trial justice erred in refusing to dismiss the indictment on the ground that, in the absence of the confessions, there was insufficient evidence before the grand jury in April 1957 to indict. We agree that an indictment cannot stand if there is no evidence before the grand jury to sustain it. However, there is nothing in the record showing what evidence was presented to the grand jury that returned the indictment. The record shows that an indictment was returned and defendant pleaded to it. In the absence of evidence to the contrary, it must be assumed that the grand jury did their duty and returned the indictment on the basis of competent evidence according to law.

Under point II the defendant has briefed and argued several exceptions to evidentiary rulings. After the trial justice made the finding that Mrs. Conlon was not defendant's common-law wife, she was asked by the state's attorney whether she knew where defendant was living during certain periods in 1955. The defendant's objections to such questions were overruled. However, Mrs. Conlon's refusal to answer such questions on the ground that her answers might tend to incriminate her was sustained by the trial justice on each of several occasions when she claimed such constitutional right.

Under such exceptions defendant contends that, even though the questions were not answered, he was prejudiced by the fact that Mrs. Conlon was required to repeat the word "incriminate" each time she refused to answer; that the very use of the word "incriminate" was prejudicial to him since it carried the implication that he had been living with her; and that this was prejudicial because it tended to show that defendant was involved in some other offense. We do not agree with this contention. If the witness had answered it would not necessarily follow that her answers would be inadmissible if they were connected with and formed a link, directly or indirectly, with the offense charged

352

in the instant case, even though such testimony might show that defendant was involved in another offense. *State v. Colangelo*, 55 R. I. 170; *State v. Durkee*, 68 R. I. 73.

The defendant's argument is based on his assumption that the implication was that defendant was living with Mrs. Conlon during such time in an unmarried state. In our opinion such testimony was material and would have been admissible, in the absence of the witness' refusal to testify on constitutional grounds, even though it showed defendant was involved in some other offense. Her refusal to answer on constitutional grounds required her to state her reason and to use the word "incriminate." In such circumstances defendant's contention that he was prejudiced thereby is without merit. We have carefully examined all of the exceptions briefed and argued by defendant under point II (B) and find them to be without merit.

Under point III (A) defendant contends that the trial justice erred in refusing to direct a verdict of acquittal on the first count of the indictment on the ground that the proof showed that the child died on November 17, 1955. The contention that the variance between the date charged and the date proved is fatal lacks merit. See *State v. Nagle*, 14 R. I. 331, 334.

Under point III (B) defendant contends that the statutory short form indictment charging that defendant murdered the child does not charge murder in the first degree. The contrary has been decided in *State v. Jefferds*, 89 R. I. 272. However, defendant argues under points III (B) and (C) that even if the indictment properly charges murder in the first degree, there is no evidence of a premeditated design to kill and therefore no evidence of either first or second degree murder. On the basis of such argument he contends that the trial justice erred in charging on murder in either degree. We do not agree with that contention. It is well settled that a charge to the jury must be applicable to the facts presented in evidence. *State v. Saccoccio*, 50

R. I. 356, 362. It is also true that premeditation is as essential to second degree murder as it is to first degree murder and that the difference is merely the length of time that the premeditation existed before the killing. *State* v. *Fenik*, 45 R. I. 309. The statutory definition of murder is set forth in general laws 1956, §11-23-1. The trial justice's instructions on this point were based on the statutory definition and were correct in law.

After carefully reading the transcript it is our opinion that there is sufficient evidence in the record to warrant a charge on first and second degree murder. It was proper for the jury to determine from such evidence and the reasonable inferences therefrom whether a finding of guilt in either degree was warranted. In the circumstances it is our opinion that the charge on murder was justified and therefore was not prejudicial.

Under point III (D) defendant has briefed and argued several exceptions contending that the trial justice erred in his charge defining manslaughter. The trial justice pointed out to the jury that under G. L. 1938, chap. 625, §11, now G. L. 1956, §12-17-14, if they found defendant not guilty of either degree of murder they could still find him guilty of manslaughter. He then charged that manslaughter is the unlawful killing of a human being without malice expressed or implied and without premeditation. He also charged that if the jury found that death resulted from an accident as claimed by defendant they would have to acquit him, but if they found that the state had proved that defendant without premeditation or malice aforethought did deliver the fatal blow or blows resulting in the child's death their verdict must be guilty of manslaughter.

After carefully reading the instructions given we are satisfied that they were correct and applied to the evidence. *State* v. *Fenik, supra,* at page 314. The medical examiner's testimony of the cause of death and defendant's own statements in exhibits 13 and 14 describing the events on the day

in question are competent evidence from which the jury could reasonably have inferred that blows were the cause of death. There is no merit in defendant's contention that voluntary manslaughter is not involved in this case or that the trial justice was in error in defining both voluntary and involuntary manslaughter at one time without distinguishing them.

Under point IV (A) defendant has briefed and argued several exceptions based on his contention that the trial justice erred in his refusal to direct a verdict of not guilty on the ground that there was insufficient evidence. In view of what we have already stated we are of the opinion that this contention has no merit and requires no further consideration.

We now come to defendant's exception to the denial of his motion for a new trial. In his decision denying such motion the trial justice, after carefully reviewing the evidence, has strongly approved the jury's verdict and has given clear and convincing reasons for so doing. We are satisfied that he has exercised his independent judgment in passing upon the weight of the evidence and the credibility of the witnesses and that he has not overlooked or misconceived any of the material evidence. For these reasons his decision should not be disturbed.

We have considered all of defendant's exceptions which he has briefed and argued, although we may not have specifically referred to them, and have found them to be without merit.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for further proceedings.

*J. Joseph Nugent,* Attorney General, *Raymond J. Pettine,* Assistant Attorney General, for State.

*Aram A. Arabian,* Public Defender, for defendant.