STATE

v.

Clyde GILLESPIE.

No. 2006–337–C.A.

Supreme Court of Rhode Island.

Dec. 3, 2008.

Lauren S. Zurier, Providence, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

The defendant, Clyde Gillespie (defendant), appeals his convictions for second-degree murder and for failing to report a death with the intention of concealing a crime. He alleges that the trial justice erred in: (1) instructing the jury that premeditation is not an element of second-degree murder; (2) instructing the jury on second-degree murder where, as the defendant contends, such a charge was not supported by the evidence; and (3) excluding evidence of the prior conviction of a state's witness. For the reasons hereinafter set forth, we affirm the judgment of the Superior Court.

### I

### Facts and Travel

On November 24, 1998, police responded to an unoccupied apartment in Providence, Rhode Island, where a cleaning crew had discovered a decomposing body wrapped in bedding and curtains in an attic crawl space accessible through a padlocked closet. Further investigation by the police revealed that defendant and his wife, Betty Sue Gillespie, were the last tenants to occupy the apartment.

After locating defendant, the police initially questioned him about his wife's whereabouts without disclosing that a body had been found in his former apartment. The defendant claimed that he had not seen Betty Sue since July, when she left him following an argument over another woman. He admitted, and bank records confirmed, that he since had been using Betty Sue's ATM card to withdraw money from her credit-union account. After the police informed him that they had discovered a body in the apartment, defendant acknowledged that the body was indeed that of Betty Sue. He explained that he had found her dead in bed one morning in July after a night during which she had been smoking crack cocaine. According to defendant, he wrapped Betty Sue's body in bed sheets, hid it in the attic crawl space, and padlocked shut the closet door after panicking over the thought that he would be held accountable for her death. A subsequent autopsy confirmed that the body was that of Betty Sue, but it also indicated that the cause of death was manual strangulation.

On April 16, 1999, a grand jury indicted defendant for the murder of Betty Sue and for failing to report a death with the intention of concealing a crime. *See* G.L. 1956 § 11–23–1 (murder) and G.L. 1956 § 23–4–7 (failing to report a death with the intention of concealing a crime). A jury trial followed in January 2006,[1] during which the state presented several witnesses, including Betty Sue's sister, Estelle Woods, and the chief medical examiner, Elizabeth Laposata, M.D., who had conducted the autopsy on Betty Sue.

At the start of trial, the state moved *in limine* to prevent defendant from impeaching Ms. Woods with a 1989 conviction for loitering for indecent purposes. *See* G.L. 1956 § 11–34–8. Citing the remoteness of the conviction and the fact that it did not involve dishonesty or false statement, the trial justice granted the motion *in limine* without prejudice to the issue being reconsidered if the trial testimony of Ms. Woods ended up making the conviction relevant.[2]

After the state's direct examination of Ms. Woods, defendant renewed his request to impeach her with her 1989 conviction. However, the trial justice affirmed her earlier ruling excluding the conviction on the same grounds she previously had articulated—viz., that the conviction was too remote and was not relevant to Ms. Woods's character for truthfulness. The trial justice concluded that the likelihood that the jury would use the conviction as improper character evidence "tip[ped] the balance toward being unduly prejudicial as compared to any probative value for impeachment purposes."

1. We note with some concern that almost seven years passed between defendant's indictment and his trial. A review of the record indicates that the delay was caused at least in part, by the withdrawal of two of defendant's attorneys, as well as investigations and psychiatric examinations by both parties into defendant's competency to stand trial and his proposed diminished-capacity defense.

2. At trial, Ms. Woods testified that she last had seen Betty Sue alive with defendant on September 13, 1998. Ms. Woods explained that, when she did not see her sister for the next three or four weeks, she began to look for her at area soup kitchens. Ms. Woods testified that she had encountered defendant on two occasions at local soup kitchens and that he had told her that Ms. Woods had left him and had gone to a shelter and that he had not heard from her. Finally, Ms. Woods testified that she never had seen defendant wearing a suit. (Earlier trial testimony by a police officer revealed that defendant initially had told police that he had placed the padlock on the closet to protect some expensive suits that he was storing there.)

Doctor Laposata testified for the state regarding the condition of Betty Sue's body. She described the body as having been wrapped in three layers of sheets and draperies and noted the peculiar manner in which it was clothed: both the bra and underwear were inside out. Doctor Laposata testified that her examination of Betty Sue's body had revealed that Betty Sue had sustained injuries to her neck contemporaneously with her death, including a fractured hyoid bone and hemorrhaging in the upper neck tissue. According to Dr. Laposata, a fractured hyoid bone is "a classic marker for death by manual strangulation." She also testified that any other potential physical injuries were obscured by the body's advanced state of decomposition. Although toxicology tests had revealed the presence of cocaine and alcohol in Betty Sue's system, Dr. Laposata concluded to a reasonable degree of scientific certainty that the cause of death was asphyxia caused by manual strangulation.

The defendant did not testify or present any evidence at trial. The trial justice instructed the jury on both the crime of first-degree murder and the lesser-included offense of second-degree murder.[3] The trial justice's jury instructions stated in relevant part:

"I will now address the elements of the crime of murder and you must know that to convict of murder, the State must prove each of the elements beyond a reasonable doubt. Murder generally is the unlawful killing of a human being with malice aforethought. A willful, malicious and premeditated killing is murder in the first degree. In order to convict the defendant of first degree murder, the State must prove beyond a reasonable doubt that within the dates in question, the defendant, Clyde Gillespie, killed Betty Sue Gillespie by manual strangulation and that he did so willfully, deliberately, maliciously and with premeditation. An act is done willfully if done voluntarily and intentionally and not by mistake or accident. The terms 'deliberate' and 'voluntary' are actions resulting from the defendant's prior consideration of the act of killing itself. Such a prior consideration, however, must have existed in the mind of the defendant for more than simply a moments [sic] duration. In other words, the defendant must have deliberated and already fixed in his mind for more than a mere moment an intention to kill before the killing occurred. Perhaps, the best that can be said of deliberation is that it requires a cool mind that is capable of reflection and premeditation, that it requires that one with a cool mind did in fact reflect for more than a moment before the killing. Malice may be expressed or implied. Malice can arise from either an expressed intent to kill or to inflict great bodily harm. Malice may be implied or inferred from all the surrounding circumstances.

"*  *  *

"Our law also recognizes murder in the second degree as a lesser included offense to the charge of murder. To prove the defendant guilty of murder in the second degree, the State must prove beyond a reasonable doubt that he killed Betty Sue Gillespie by manual strangulation within the dates in question and that he did so intentionally and mali-

---

3. The trial justice also instructed the jury on the crime of failing to report a death with the intention of concealing a crime. The defendant does not appeal that jury charge. He does, however, maintain that if we hold that his conviction for second-degree murder is invalid, we also must vacate his conviction for failing to report a death with the intention of concealing a *crime* because there would be no *crime* upon which to base that charge.

ciously. Unlike first degree murder, however, second degree murder does not require the State to prove beyond a reasonable doubt that the defendant killed with premeditation and deliberation. If a person's conscious intent or design to kill existed only amount [*sic*] momentarily or fleetingly, or if you are not convinced beyond a reasonable doubt that it existed for more than a moment or deliberately, it is second degree murder. On the other hand, if such a conscious design or intent existed for more than a mere moment and was a product of the deliberation, then the crime rises to the level of first degree murder. Just as with the instructions that I have given you as to first degree murder, as with second degree murder as well, there must be proof of malice and that malice may be expressed or implied.

"\* \* \*

"In this case, therefore, if the State satisfies you beyond a reasonable doubt that the defendant, Clyde Gillespie, killed Betty Sue Gillespie, between the dates of June 1st, 1998 and November 24, 1998 by manual strangulation and that he did so intentionally and maliciously and with deliberation and premeditation, then you may return a verdict of guilty on the charge of first degree murder. If you find that the State has failed to prove beyond a reasonable doubt that such a killing was premeditated or deliberate, but you nonetheless determine that Clyde Gillespie intentionally and maliciously killed Betty Sue Gillespie, then you may return a verdict of guilty on the lesser included offense of second degree murder."

The defendant then proceeded to object on two grounds to the jury instructions cited above. First, defendant argued that

it was improper to instruct the jury on second-degree murder because the proposed cause of death was manual strangulation, which he argued required the deliberation and premeditation that occurs only with first-degree murder. Secondly, defendant contended that the trial justice erred in instructing the jury that premeditation is not an element of second-degree murder. Rejecting both objections, the trial justice declined to amend her jury instructions.

On January 13, 2006, the jury convicted defendant of second-degree murder and of failing to report a death with the intention of concealing a crime. The defendant subsequently filed a motion for a new trial, in which he again challenged the second-degree murder jury instructions. The trial justice denied defendant's motion for a new trial and sentenced him to life imprisonment for the murder conviction and five years imprisonment for the conviction on failing to report a death, to be served consecutively.

## II

### Analysis

#### A

#### Elements of Second–Degree Murder

The defendant argues that the trial justice committed reversible error when she declined to instruct the jury that premeditation is an element of second-degree murder. He cites a line of cases from this Court in which we either impliedly or expressly have stated that premeditation is an element of second-degree murder. *See, e.g., State v. Amazeen,* 526 A.2d 1268, 1271 (R.I.1987); *State v. Crough,* 89 R.I. 338, 353, 152 A.2d 644, 652 (1959); *State v. Fenik,* 45 R.I. 309, 315, 121 A. 218, 221 (1923).

■ We review jury instructions on a *de novo* basis. *State v. Graham,* 941 A.2d 848, 855 (R.I.2008); *State v. Imbruglia,* 913 A.2d 1022, 1031 (R.I.2007). "General Laws 1956 § 8–2–38 requires the trial justice to instruct the jury on the law to be applied to the issues raised by the parties." *State v. Lynch,* 770 A.2d 840, 846 (R.I. 2001). "There is no requirement for particular words to be used in a charge." *Id.* (citing *State v. Mastracchio,* 546 A.2d 165, 173 (R.I.1988)). Instead, "[t]he trial justice may instruct the jury in his or her own words as long as the charge sufficiently addresses the requested instructions and correctly states the applicable law." *Id.* (quoting *Mastracchio,* 546 A.2d at 173). Thus, in evaluating the adequacy of jury instructions, "[w]e will not review a single phrase or sentence in isolation," *State v. Fernandes,* 783 A.2d 913, 916 (R.I.2001), but rather will examine it in the context of the whole instruction to determine whether it would have confused or misled the jury. *Imbruglia,* 913 A.2d at 1031.

■ Section 11–23–1 defines murder as "[t]he unlawful killing of a human being with malice aforethought" and separates it into two degrees. "Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing * * * is murder in the first degree. Any other murder is murder in the second degree."[4] *Id.* "In other words, murder in the second-degree 'is any killing of a human being committed with malice aforethought that is not defined by statute as first-degree murder.' " *State v. Texieira,* 944 A.2d 132, 142 (R.I. 2008) (quoting *State v. Parkhurst,* 706 A.2d 412, 421 (R.I.1998)).

Although § 11–23–1 imports the old common-law definition of murder as a kill-

ing committed with malice aforethought, its delineation of murder into degrees is a statutory creation. *See State v. Mattatall,* 603 A.2d 1098, 1105–06 (R.I.1992) (citing *State v. Pine,* 524 A.2d 1104, 1107 (R.I. 1987)). Unfortunately, however, § 11–23–1 goes no further in distinguishing between first- and second-degree murder or in defining such terms as "deliberate" or "premeditated." The onus, therefore, has fallen on the judiciary to interpret this distinction; admittedly, we have not fulfilled our duty in that regard with the greatest clarity. We hope that this opinion will rectify any confusion about the distinction between first- and second-degree murder.

■ As § 11–23–1 indicates, a murder must be "willful, deliberate, malicious, and premeditated" for it to rise to the level of first-degree murder. Because § 11–23–1 defines first-degree murder as a "willful, deliberate, malicious, and premeditated killing," and second-degree murder as "[a]ny other murder," it necessarily follows that second-degree murder does not encompass "willful, deliberate, malicious, and premeditated" killings. Rather, the only requirement for a killing to qualify as second-degree murder is that it be committed with malice aforethought. *See id.*

■ We have defined malice aforethought as "an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life." *Texieira,* 944 A.2d at 142 (quoting *State v. McGranahan,* 415 A.2d 1298, 1302 (R.I.1980)). Malice aforethought arises either from "an express intent to kill or to inflict great bodily harm or from a hardness of the heart, cruelty, wickedness of disposition, reck-

---

4. First-degree murder also includes felony murder for felonies specifically listed in G.L. 1956 § 11–23–1.

lessness of consequence, and a mind dispassionate of social duty."[5]  *Id.* (quoting *McGranahan,* 415 A.2d at 1302).

■■■■  Thus, we have recognized three theories of second-degree murder, each grounded in a different aspect of malice aforethought.  *State v. Iovino,* 554 A.2d 1037, 1039 (R.I.1989).  The first, which is the theory upon which the trial justice instructed the jury in this case, involves those killings in which the defendant formed a momentary intent to kill contemporaneous with the homicide.  *See Texieira,* 944 A.2d at 142, 142 n. 13; *State v. Sosa,* 839 A.2d 519, 527 (R.I.2003); *State v. Barrett,* 768 A.2d 929, 944 (R.I.2001).  A second theory includes felony murder for inherently dangerous felonies that are not expressly listed within the statutory definition of first-degree murder.  *Parkhurst,* 706 A.2d at 421; *see also State v. Vorgvongsa,* 692 A.2d 1194, 1196 (R.I. 1997).  Finally, second-degree murder may be charged where the defendant killed with wanton recklessness or "conscious disregard for the possibility of death or of great bodily harm."  *Parkhurst,* 706 A.2d at 421; *see also Vorgvongsa,* 692 A.2d at 1196; *Iovino,* 554 A.2d at 1039.

Again, the issue in this case is the distinction between the premeditation characteristic of first-degree murder and the momentary intent to kill involved in second-degree murder.  Regrettably, our overly liberal use of the term "premeditation" in some past decisions has contributed to a certain amount of confusion regarding the required elements of second-degree murder.  As defendant correctly notes, on various occasions we either have implied or expressly stated that premeditation is an element of second-degree murder.  *See, e.g., Tarvis v. Moran,* 551 A.2d 699, 702 (R.I.1988); *Amazeen,* 526 A.2d at 1271; *Crough,* 89 R.I. at 353, 152 A.2d at 652. Specifically, we have indicated that premeditation is an aspect of malice aforethought applicable to both degrees of murder, *see, e.g., Mattatall,* 603 A.2d at 1106; *Iovino,* 554 A.2d at 1039, and that the distinction between first- and second-degree murder lies in the extent of premeditation involved in the killing.  *See, e.g., Tarvis,* 551 A.2d at 702; *Amazeen,* 526 A.2d at 1271; *Crough,* 89 R.I. at 353, 152 A.2d at 652; *Fenik,* 45 R.I. at 315, 121 A. at 221.  On other occasions, however, we correctly have excluded the word "premeditation" from our definition of second-degree murder and instead used the term "intent."  *See, e.g., Texieira,* 944 A.2d at 142; *State v. Grabowski,* 644 A.2d 1282, 1285 (R.I.1994); *State v. Clark,* 423 A.2d 1151, 1161 (R.I.1980).

■■■■  Despite this semantic incongruity, we nonetheless have remained consistent in our application of the legal principle underlying the distinction between first- and second-degree murder.  In all of our cases, regardless of the terminology employed, we have acted in accordance with § 11–23–1 and have held that the distinction between first-degree and momentary-intent-based second-degree mur-

**5.** Our definition of "malice aforethought" comports with the common-law definition of the phrase.  *See* 2 *Wharton's Criminal Law,* § 139 at 246–47 (Torcia 15th ed. 1994).  The defendant argues that use of the term "aforethought" imports premeditation into the definition of murder.  It is true that at early English common law, the word "aforethought" was used to signify premeditation— a requirement for murder at that time.

Wayne R. LaFave, *Criminal Law,* § 14.1 at 725 (4th ed. 2003).  However, as courts in England, and later in the United States, began to recognize other forms of murder absent premeditation, "aforethought" lost its meaning.  *Id.* at 725–26.  Today, "since malice need exist only at the time the homicidal act is committed, the term 'aforethought' has come to be superfluous."  2 *Wharton's Criminal Law,* § 139 at 246.

der is the *duration* of the defendant's intent to kill. *See, e.g., Texieira,* 944 A.2d at 142, 142 n. 13; *Crough,* 89 R.I. at 353, 152 A.2d at 652; *Fenik,* 45 R.I. at 315, 121 A. at 221. First-degree murder requires that the defendant harbored a more-than-momentary intent to kill prior to committing the homicide—in essence, that he or she acted with premeditation. *Texieira,* 944 A.2d at 142; *Vorgvongsa,* 692 A.2d at 1196. In contrast, the momentary-intent theory of second-degree murder involves a fleeting intent that is contemporaneous with the murder. *See Texieira,* 944 A.2d at 142–43; *Sosa,* 839 A.2d at 527. Let there be no further confusion: premeditation is not a requirement of malice aforethought and thus is not an element of second-degree murder. *See Texieira,* 944 A.2d at 142 ("[I]t is well-settled in this jurisdiction that 'the distinction between murder in the first degree and murder in the second degree is that murder in the first degree requires premeditation.'" (quoting *Vorgvongsa,* 692 A.2d at 1196)).

We believe that our holding is consistent with the manner in which other jurisdictions have interpreted similar murder statutes. Like § 11–23–1, the relevant portions of the murder statutes in California, North Carolina, and Idaho define murder generally as an unlawful homicide committed with malice aforethought. *See* Cal.Penal Code § 187 (West 2008); Idaho Code Ann. § 18–4001 (Michie 2004); *State v. Vance,* 328 N.C. 613, 403 S.E.2d 495, 501 (1991). Further, they specifically distinguish first-degree murder, as do we, as including willful, deliberate, and premeditated killings and define second-degree murder, as do we, as encompassing all other murders. *See* Cal.Penal Code § 189 (West 2008); Idaho Code Ann. § 18–4003 (Michie 2004); N.C. Gen.Stat. § 14–17 (LexisNexis 2007). In interpreting such statutes, courts in each of these jurisdictions likewise have held that premeditation is not an element of second-degree murder. *See People v. Romero,* 44 Cal.4th 386, 79 Cal.Rptr.3d 334, 187 P.3d 56, 70 (2008); *State v. Dillon,* 93 Idaho 698, 471 P.2d 553, 569 (1970) ("The district court's instruction * * * defined 'malice aforethought' as 'malice and premeditation.' This instruction should not have been given, because 'premeditation' is the word used to denote a mental element which distinguishes murder in the first degree from murder in the second degree * * *."); *State v. Melton,* 307 N.C. 370, 298 S.E.2d 673, 677 (1983) ("Premeditation and deliberation are not elements of murder in the second degree.").

In the case at bar, the trial justice correctly instructed the jury on the elements of second-degree murder and its distinction from murder in the first degree. Before discussing the degrees of murder, she explained, consistent with § 11–23–1, that "[m]urder generally is the unlawful killing of a human being with malice aforethought." The trial justice then explained that, in order to convict defendant of first-degree murder, the jury would have to find beyond a reasonable doubt that he had killed his wife willfully, deliberately, maliciously, and with premeditation. After stating that second-degree murder does not require proof of premeditation or deliberation, the trial justice then proceeded to instruct on the momentary-intent theory:

"If a person's conscious intent or design to kill existed only amount [*sic*] momentarily or fleetingly, or if you are not convinced beyond a reasonable doubt that it existed for more than a moment or deliberately, it is second degree murder. On the other hand, if such a conscious design or intent existed for more than a mere moment and was the product of the deliberation, then the crime

rises to the level of first degree murder."

This instruction is entirely consistent with the momentary-intent theory of second-degree murder that we have recognized as inherent in § 11–23–1. The instruction clearly distinguished for the jury the momentary-intent concept from the premeditation required for first-degree murder. There was no error.

## B

### Appropriateness of the Trial Justice's Instruction on Second–Degree Murder

The defendant next argues that the trial justice erred by instructing the jury on the lesser-included offense of second-degree murder because, he contends, it was unsupported by the evidence. Based on Dr. Laposata's testimony that manual strangulation requires several minutes to accomplish, defendant asserts that it inherently requires premeditation and deliberation. Thus, he concludes, evidence of manual strangulation never can support an instruction for second-degree murder.

Again, this Court reviews jury instructions *de novo. Graham,* 941 A.2d at 855; *Imbruglia,* 913 A.2d at 1031. In determining the appropriateness of a trial justice's instruction on a lesser-included offense, we look to see if such an instruction is warranted by the evidence. *See State v. Brown,* 898 A.2d 69, 84 (R.I.2006); *State v. Garcia,* 883 A.2d 1131, 1137 (R.I. 2005); *State v. Figueras,* 644 A.2d 291, 294 (R.I.1994). "[T]here must be an actual and adequate factual dispute concerning

the element that distinguishes the greater from the lesser offense" to justify an instruction on both. *Vorgvongsa,* 692 A.2d at 1197 (citing *Figueras,* 644 A.2d at 294).

"There is no question that second-degree murder is a lesser included offense of the crime of murder in the first degree." *Vorgvongsa,* 692 A.2d at 1196 (citing *Grabowski,* 644 A.2d at 1285); *see also* § 11–23–1 and G.L. 1956 § 12–17–14. "[I]f the state proceeds on a theory of an intent to kill and the duration of the intent to kill is questionable, an instruction on both first- and second-degree murder should be given." *Parkhurst,* 706 A.2d at 421 (citing *Fenik,* 45 R.I. at 315, 121 A. at 221).

We never have held that convictions for manual strangulation are limited to murder in the first degree.[6] In fact, on numerous occasions, we have affirmed second-degree murder convictions where the cause of death was manual strangulation. *See, e.g., State v. Gomes,* 881 A.2d 97, 99 (R.I.2005) (where the defendant both strangled and stabbed the victim in the neck); *State v. Diaz,* 521 A.2d 129, 130 (R.I.1987) (where the evidence suggested that the defendant manually strangled the victim in an attempt to quiet her during an argument); *State v. Danahey,* 108 R.I. 291, 292, 294, 274 A.2d 736, 737, 738 (1971) (where the defendant strangled the victim with a necktie).[7]

Our decisions in these cases are consistent with our interpretation of premeditation and first-degree murder. As we explained above, premeditation constitutes a more-than-momentary period of intent formed in the defendant's mind *before*

---

6. We also note that the General Assembly chose not to list manual strangulation in the murder statute alongside murders perpetrated by poison and by lying in wait, which acts are statutorily classified as exclusively first-degree murder. *See* § 11–23–1.

7. We even have upheld a manslaughter conviction where the cause of death was manual strangulation. *See State v. Cohen,* 93 R.I. 215, 216, 218, 172 A.2d 737, 738, 739 (1961), *overruled on other grounds, State v. Caruolo,* 524 A.2d 575, 585 n. 3 (R.I.1987).

commission of the homicidal act. *See Texieira*, 944 A.2d at 142. This is different from the amount of time that it takes the defendant to actually perpetrate the homicide. *See State v. Bingham*, 105 Wash.2d 820, 719 P.2d 109, 113–14 (1986). As the trial justice aptly observed, the most that can be gleaned from the fact that the cause of death was manual strangulation is that a defendant had the *opportunity* to premeditate and deliberate. *See id.*; *see also Perez–Ortiz v. State*, 954 So.2d 1256, 1259 (Fla.Dist.Ct.App.2007).[8] We likewise have said that "[t]he act of killing, of itself, is not sufficient to give rise to a presumption that it was premeditated and deliberate. Indeed, although a homicide without additional evidence is presumed to be murder, the presumption ordinarily rises no higher than murder in the second degree." *Mattatall*, 603 A.2d at 1106 (quoting 2 *Wharton's Criminal Law*, § 140 at 182, 184–85 (Torcia 14th ed. 1979)). In the absence of additional evidence clearly indicating that a defendant did indeed premeditate and deliberate, an instruction on the lesser-included offense of second-degree murder is appropriate.

The defendant cites two cases in which we upheld a trial justice's refusal to instruct on second-degree murder on the grounds that the evidence supported only the conclusion that the defendant killed with premeditation and deliberation. *See State v. Brown*, 898 A.2d 69, 84–85 (R.I. 2006); *Sosa*, 839 A.2d at 526–27. Both cases, however, easily are distinguishable from the case at bar because of the extensive evidence in each case of premeditation and deliberation. *See Brown*, 898 A.2d at 73, 84–85 (victim slowly asphyxiated after the defendant sexually assaulted her, stabbed her in the neck several times, disconnected the telephone cord, and used it to bind her arms and strangle her); *Sosa*, 839 A.2d at 526–27 (shooting death of victim followed: (1) an altercation with the defendant days before the murder; (2) verbal threats from the defendant minutes before the murder; and (3) the defendant's departure from the scene of the threats to retrieve a gun before returning and shooting the victim).

In the case at bar, the limited evidence concerning the circumstances of Betty Sue's strangulation illustrates that the jury could have had reasonable doubt about whether defendant harbored the premeditation required for first-degree murder. As Dr. Laposata testified, the advanced state of decomposition of Betty Sue's body obscured any evidence of other physical injuries that might have reinforced the notion that the murder was premeditated. In contrast, other evidence, such as the haphazard manner in which Betty Sue was clothed, militates against the theory that the murderer acted with premeditation. Accordingly, the trial justice did not err in instructing the jury on the lesser-included offense of second-degree murder.

## C

### Estelle Woods's Prior Conviction

■ Finally, defendant contends that the trial justice abused her discretion in precluding defendant from impeaching Estelle Woods with her 1989 conviction for loitering for indecent purposes. The defendant cites a number of cases in which

---

8. In fact, the facts of past cases demonstrate that manual strangulation is possible even absent any intent to kill. *See State v. Diaz*, 521 A.2d 129, 130 (R.I.1987) (evidence indicated that the strangulation might have been the result of the defendant trying to quiet the victim during an argument); *Randall v. State*, 760 So.2d 892, 901–02 (Fla.2000) (evidence suggested that the defendant strangled the victims for his own sexual gratification during consensual sex, not with an intent to kill).

this Court has upheld a trial justice's ruling permitting impeachment of defense witnesses with evidence of prior convictions that were similarly remote in time to Ms. Woods's conviction. *See, e.g., State v. Silvia*, 898 A.2d 707, 717–18 (R.I.2006); *State v. Camirand*, 572 A.2d 290, 295 (R.I. 1990); *State v. Pope*, 414 A.2d 781, 784, 785 (R.I.1980), *overruled on other grounds*, *State v. Acquisto*, 463 A.2d 122, 124–25 (R.I.1983). He also cites several cases in which we upheld—as not being exceedingly prejudicial—impeachments of defendants using prior convictions for offenses that were similar to the offenses for which those defendants were standing trial. *See, e.g., State v. Rodriquez*, 731 A.2d 726, 731–32 (R.I.1999); *Mattatall*, 603 A.2d at 1116–18; *State v. Pailin*, 576 A.2d 1384, 1387, 1388 (R.I.1990). In light of these cases, defendant concludes that the trial justice in the case at hand could not reasonably have determined that Ms. Woods's prior conviction was either too remote or too prejudicial to be admitted.

■ "[I]t is well settled in this jurisdiction that the trial justice has broad discretion in deciding whether or not to admit evidence of prior convictions * * *" for impeachment purposes. *State v. Drew*, 919 A.2d 397, 406 (R.I.2007) (quoting *Silvia*, 898 A.2d at 718). "We will not disturb a trial justice's ruling in this regard absent an abuse of discretion." *Silvia*, 898 A.2d at 718 (citing *State v. Morel*, 676 A.2d 1347, 1357 (R.I.1996)). "The standard of abuse of discretion is one that gives extreme deference to the trial justice's determination." *State v. Remy*, 910 A.2d 793, 797 (R.I.2006) (quoting *State v. Werner*, 831 A.2d 183, 204 (R.I.2003)). According-

ly, we may uphold a trial justice's ruling even if we would have ruled differently had we been in the trial justice's position. *See Werner*, 831 A.2d at 204.

■ According to Rule 609 of the Rhode Island Rules of Evidence, evidence of any prior conviction, regardless of the conviction's age, potentially is admissible to impeach a witness. *State v. Coleman*, 909 A.2d 929, 940–41 (R.I.2006). *See also* Rule 609. Furthermore, "the prior conviction need not involve dishonesty, false statement, or a felony to be admissible." *State v. Medina*, 747 A.2d 448, 450 (R.I. 2000). However, evidence of a prior conviction is "not admissible if the court determines that its prejudicial effect substantially outweighs the probative value of the conviction." Rule 609(b). In making this determination, "the trial justice must consider 'the remoteness of the conviction, the nature of the crime, and the defendant's disdain for the law as represented by the extent of his prior criminal record * * *.'" *Remy*, 910 A.2d at 798 n. 2 (quoting *Mattatall*, 603 A.2d at 1117).

■ In the case at bar, the trial justice appropriately considered these factors before concluding that the potential prejudice of Ms. Woods's 1989 conviction outweighed any probative value for determining her credibility. The trial justice found that the conviction's probative value was limited by its age of approximately sixteen years.[9] The defendant correctly points out that we have upheld impeachments using similarly remote convictions. *See, e.g., Silvia*, 898 A.2d at 717–18; *Camirand*, 572 A.2d at 295; *Pope*, 414 A.2d at 784–85. However,

---

9. The record suggests that there may have been some confusion on defendant's part as to how the court should measure the age of a prior conviction. "[T]he appropriate time period to use in evaluating the remoteness of a previous conviction when determining wheth-

er or not to permit it to be used for impeachment purposes is the time between the date of the previous conviction and the date of the present trial." *State v. Remy*, 910 A.2d 793, 797 (R.I.2006).

we also have affirmed trial court rulings excluding evidence of prior convictions that also were similarly remote to the one in the case at hand and to the several in the cases defendant cited. *See Werner,* 831 A.2d at 187, 203–05 (no abuse of discretion where the trial justice excluded as stale several convictions ranging from six to fifteen years in age); *State v. Wilson,* 568 A.2d 764, 767–68 (R.I.1990) (upholding a trial justice's exclusion of thirteen-year-old convictions for robbery, larceny, and forgery where the witness had only one minor conviction for a traffic offense in the intervening years). Taken together, these cases illustrate both the extreme deference that we consistently have afforded trial justices concerning Rule 609 rulings and the fact that remoteness in time alone is not dispositive of the probative-prejudicial determination.

Rather, the nature of the crime and the extent of the witness's criminal record also inform the trial justice's Rule 609 determination. *See Remy,* 910 A.2d at 798 n. 2. In the case at hand, the trial justice addressed the crime of loitering for indecent purposes and properly concluded that it was not indicative of Ms. Woods's credibility. Further diminishing the conviction's probative value was the fact that it was the only conviction in Ms. Woods's criminal record available to the jury.[10] Thus, the trial justice could make the discretionary decision that Ms. Woods had not demonstrated a disdain for the law that would inform the jury's assessment of her credibility.

Ultimately, the trial justice justifiably concluded that the prior conviction's potential prejudice outweighed its relatively low probative value. Loitering for indecent purposes—or prostitution, as it is more colloquially called—is a particularly ignominious crime. The trial justice's concern that the conviction would influence the jury improperly was reasonable. The defendant argues that, because we have permitted impeachments of defendants using arguably more prejudicial convictions than the one in the case at hand, the trial justice could not have excluded this conviction without abusing her discretion. Again, however, the decision whether to admit evidence of prior convictions involves the balancing of several factors that turns on the particular facts of each case. Where, as here, the trial justice has engaged in that analysis in a reasoned manner, we will not disturb her ruling.

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

---

10. Ms. Woods pleaded no contest to the same offense of loitering for indecent purposes in 1990. In accordance with our precedent, however, the trial justice ruled that the 1990 conviction was inadmissible for impeachment because it constituted a nolo contendere plea resulting only in probation. *See, e.g., Dordain v. Vose,* 655 A.2d 1100, 1101 (R.I.1995); *State v. Young,* 456 A.2d 739, 741 (R.I.1983). The defendant does not challenge that determination in this appeal.